*Philadelphia,*
*Monday,*
*April 4.*

The Commonwealth for the use of the United States, against LEWIS.

A debt due to the *United States* by a deceased revenue officer, is entitled to priority of payment from his administrators under the law of this commonwealth, whether the debt arose before or after the act of congress of 3d *March* 1797.

Congress have a constitutional right to claim a preference out of the estate of a public debtor, for

THIS was an action of debt upon an administration bond, in which the defendant was surety for the administrators of *Sharpe Delany.* The case was tried before *Yeates* J. at a *Nisi Prius* in *December* last, when an arrangement was made to enter a verdict for the penalty of the bond, subject to an agreement, the only material part of which was, that the judge should charge the jury whether the *United States* were entitled to priority by the act of 3d *March* 1797, under the facts in evidence, which facts were to be stated by the judge, and were to be considered as a special verdict, on which either party might apply to the Court in bank; and the *United States* were to be at liberty in case of necessity, to remove the cause to the Supreme Court of the *United*

debts due to the *United States;* and by the act of 3d *March* 1797 they have constitutionally claimed it as against living debtors for all debts contracted thereafter, and as against deceased debtors whether contracted before or after that law.

Upon all balances due by defaulting revenue officers, the *United States* are entitled to interest from the time of receiving the money, although the secretary of the treasury has not issued his warrant ordering the payment of the balance into the treasury. In practice, payments are made without such warrant; and the intention of the act of 2d *September* 1789 in requiring it, was that the secretary might be advised of the proceedings of the treasurer. It is a matter between the officers of government. Payments without warrant are good.

1814.

COMMON-
WEALTH
v.
LEWIS.

*States*, agreeably to the act of congress of 24th *September* 1789.

His honour did accordingly charge the jury that the *United States* were entitled to a priority, and he now reported his statement of facts to the Court, according to the agreement.

*Sharpe Delany* was appointed collector of the port of *Philadelphia*, and gave bond on the 7th *August* 1789; and he went out of office on the 30th *June* 1798. He died on the 13th *May* 1799, and on the 31st, letters of administration were taken out by his sons, and the bond in question given, with Mr. *Lewis* as their surety. On the 2d *January* 1801, they filed an inventory of the personal estate amounting to 13,615 dollars 70 cents.

Under the laws of the *United States*, and in the regular course of official transactions, *Sharpe Delany's* account was settled quarterly, always leaving a balance real or apparent against him. After his decease, his administrators rendered his official accounts to the comptroller of the treasury; and finally on the 16th of *July* 1802, a general and final settlement was made at the treasury, ascertaining a balance of 67,821 dollars 31 cents, to have been due from him to the *United States* at the time of his leaving the office. The administrators at the time of taking out the letters of administration, had full notice of the debt due to the *United States*, and they never accounted for the assets in their hands.

His honour in addition to these facts, made a minute detail of many others, principally to shew whether *Sharpe Delany's* debt was contracted before or after the act of 3d *March* 1797, upon which however he expressed no opinion to the jury, and which it will be perceived from the Court's opinion are not material.

*Rawle* and *Tilghman* for the defendant, addressed the Court upon two points, 1. The priority claimed by the *United States*. 2. The question of interest.

1. The act of 3d *March* 1797, sec. 5. provides, that " wherever any revenue officer or other person, *hereafter be-* " *coming* indebted to the *United States* by bond or other- " wise, shall become insolvent, or where the estate of any " deceased debtor in the hands of executors or administrators

" shall be insufficient to pay all the debts due from the de-
" ceased, the debt due to the *United States* shall be first paid."
3 *U. S. Laws* 421. In the case of living debtors, it was clear
the debt must be contracted after the law; and although they
would not say the law was unconstitutional, yet as it would
be unjust to give the subsequent clause in relation to de-
ceased debtors a retrospective effect, and would make it
substantially an *ex post facto* law, that consideration should
weigh with the Court, to apply the law throughout to subse-
quent debts. For this rule of construction they relied on
*Dash* v. *Van Kleeck* (a), *Ham* v. *M'Laws* (b), *Osborne* v.
*Huger* (c). 4 *Inst.* 330. 334, 335., *Plowd.* 204., *Co. Litt.*
381. a. b. In *Hydekopper's Lessee* v. *Douglas* (d), the
Supreme Court supplied the word *shall* to effect the mean-
ing of the law: in this case the Court should supply the
word *such* before deceased debtor. The counsel then inves-
tigated the facts to shew that the debt was due before the
act. They argued also that the administrators were bound
to pay the intestate's debts, according to the act of this state
of 19th *April* 1794, which gives no preference whatever to
the *United States.*

2. Interest should run only from the time of suit brought.
By the fourth section of the act of 2d *September* 1789,
1 *U. S. Laws* 36, all receipts for monies received by the trea-
surer, must be endorsed upon warrants signed by the secre-
tary of the treasury, without which warrant so signed, no
acknowledgment for money received into the public treasury
is valid. In this case no such warrant was ever issued, and
therefore the money could not be paid into the treasury.
When the act of 3d *March* 1797 charges interest in case of
suit brought, it has an eye to personal delinquency, and not
to the case of administrators.

*Dallas* for the *United States.*

1. According to the facts the debt was contracted before
the act 1797; according to the law it is immaterial whether
it was or not. The law may be constitutionally retrospective.
If *ex post facto*, it is not so in that sense in which that phrase
is used in our constitutions, where it has reference merely
to criminal laws. *Calder* v. *Bull* (e). The act takes away

(a) 7 Johns 493.      (c) 1 Bay. 179.      (e) 3 Dall. 360.
(b) 1 Bay. 93.        (d) 3 Cranch 66.

no vested right, it overthrows no actual lien, but merely claims what every state has occasionally claimed, a preference for its own debt. *Pennsylvania* has gone further, by giving a settlement by its accounting officers the effect of a judgment. The difference in the act between the preference in the case of living and a deceased debtor, cannot be gotten over. As to the first, it is any person *hereafter becoming* indebted; as to the latter, it is *the estate of any deceased debtor.* Congress have adopted a qualification of time as to the living debtor, and in the next sentence have rejected it as to the dead. The constitutionality of this law has been asserted by the Supreme Court of the *United States;* and if it be constitutional, then an administrator in this state is bound to respect the priority, because the condition of his bond is, that he shall well and truly administer according to law.

2. A warrant was not necessary to authorize the payment, nor was the want of it the cause of the omission to pay. Interest is therefore payable, according to the act of 1797, from the time the money was received; though I consent to interest from the time of *Delany's* leaving the office. The practice as to the warrant is this. It has been customary for all collectors in this city, and for the district attorney, to make payment to the bank of the *United States* without warrant. When money is paid into the treasury, the secretary issues his warrant ordering it; but this warrant is frequently issued after the money is in the treasury. It is called a *covering* warrant, and was intended to keep the secretary acquainted with the proceedings of the treasurer. This warrant is always kept by the treasurer, and is a matter which concerns the officers, not the payer.

TILGHMAN C. J. This action was brought on the bond to the Commonwealth for the due administration of the estate of *Sharpe Delany* deceased, in which the defendant was security for the administrators. *Sharpe Delany* was collector of the customs for the port of *Philadelphia*, and died largely indebted to the *United States.* His estate was unequal to the payment of his debts. The *United States* for whose use this action was brought, claim a priority in the administration of the assets, and whether they are entitled

1814.

COMMON-
WEALTH
*v.*
LEWIS.

to such priority, is the principal point in dispute. There is a second question respecting interest.

1. It was first of all contended on the part of the defendant, that although the *United States* may have assumed a priority by a law of their own, yet they cannot avail themselves of it in a suit on this bond, which was given by virtue of an act of assembly of this Commonwealth, in which the order of payment of debts is fixed; and no preference is given to the *United States*. But to this there is a plain answer. The act of assembly prescribes the form of the bond, the condition of which is, that the administrators "shall well and truly administer the estate *according to law.*" The question then is, what is the law? Had the *United States* a right to legislate on the subject, and have they made a law giving themselves a preference? If these questions are answered in the affirmative, then *according to law*, the *United States* are entitled to a preference, and the condition of the bond is broken unless their debt is first paid. Although it was thrown out in the course of the argument, that under the constitution of the *United States*, congress had no power to assume a preference, yet no reasons were assigned against the exercise of such a power. Congress have a right " to make all laws which shall be necessary " and proper for carrying into execution the several powers " vested in them by the constitution." *Art. 1. sect. 8.* By the same article and section, they have power " to lay and " collect taxes, duties, impost and excises." In order to secure to the *United States* the payment of money received by their collectors, it has been thought necessary and proper to provide, that in case of the death of the collector, without leaving estate sufficient for the payment of all his debts, the *United States* shall be first paid. Will it be said that there was no necessity for this, because congress may increase their revenue at pleasure, so as to make good any loss occasioned by the insolvency of collectors? I am afraid that it would be impossible for the government to exist, if that were the true construction of the constitution. It was impossible to enumerate all cases of necessity, and therefore it was left to congress to judge of them; and their judgment must govern, unless it should be so exercised as to be manifestly and flagrantly in breach of the constitution. If

a law is evidently useful in carrying into effect one of the powers vested in congress, we must not be over critical in enquiring into the degree of necessity. Once establish the principle, that nothing short of absolute necessity is sufficient, and the whole system becomes useless and impracticable.

But it has been suggested, that the law in question is an *ex post facto* law, and therefore void by the *ninth section of the first article*, which declares, that "no bill of attainder " or *ex post facto* law shall be passed."

It might be sufficient to remark that this provision of the constitution, relates to *criminal law only*. It has been so decided by the Supreme Court of the *United States* in the case of *Calder* v. *Bull*, 3 *Dall.* 386. But even if it were extended to civil cases, it would not prevent congress from passing a law, by which priority in payment was secured to the *United States*, from the estates of deceased persons, *without interfering with the vested rights of any of the creditors*. A general creditor has no right to any particular part of the estate of his debtor. If he wants to be secure, he should obtain a conveyance, or some kind of lien. A law which should deprive him of the benefit of a conveyance or lien by *ex post facto* operation, would indeed be most unjust. But a man who trusts to the general credit of his debtor, has no right to complain, if in case of a deficiency of assets, he loses part of his debt, in consequence of a law intended to operate for the public benefit. In all countries, it has been judged proper to make a distinction in the order of payment of debts due from deceased persons, and in most countries, debts due to the government are first paid. This often falls hard upon individuals, but is supposed to work for the general good, because losses by insolvency must be made good by taxes. The state of *Pennsylvania* always took preference to individuals, until the act of *April* 1794, which directs that debts due to the state from deceased persons, shall be last paid. But as long as she held the preference, its propriety was never doubted; and even yet she takes a preference with regard to the estates of *living debtors*, for an account settled by the accounting officers of the Commonwealth, becomes a lien on all the real estate of the debtor.

It will appear from these observations, that if the congress have judged it necessary to give a preference to the *United States*, it is no more than most other governments have done; which strengthens the argument in favour of the necessity and propriety of the measure. But the validity of this law has been already decided in the case of the *United States against Fisher &c. assignees of Blight*, 2 *Cranch* 358, by the Supreme Court of the *United States*, who in all cases arising under the constitution or acts of congress made in pursuance of it, are judges in the last resort. Considering the law as settled by this decision, I should have abstained from the few remarks which I have made, were it not, that on our own bench, we are not unanimous in opinion.

I will now consider the act of congress, in order to see whether it embraces the case of *Sharpe Delany*. It is enacted by the *5th section of the act of 3d March* 1797, "that where "any revenue officer or other person, hereafter becoming "indebted to the *United States* by bond or otherwise, shall "become insolvent, or where the estate of any deceased "debtor in the hands of executors or administrators shall "be insufficient to pay all the debts due from the deceased, "the debt due to the *United States* shall be first satisfied." It is contended first, that all the provisions of this section are confined to debts contracted after the passing of the act; and next, that *Delany's* debt was contracted prior to the act, and therefore not within it. The argument is this. It is the intention of the act expressly declared, that in case *of insolvency of living persons*, there is no preference as to debts contracted *before*, and therefore it must be presumed, that there was the same intent in cases of *deceased persons*, especially as such intent is most agreeable to justice, and it is asked what reason there could be for a distinction. It would be very agreeable to me, if I could think the defendant's construction right, because he is an innocent surety in danger of suffering by an act of kindness. But when the meaning appears to be plain, it must govern the construction. When in one part of a sentence, the expressions are persons *hereafter becoming indebted*, and in another part these expressions are changed to *any debtor*, and these two descriptions are applied to different cases, how can it be maintained that the intent is the same? If indeed no reason can be assigned for

a difference, I agree that the intent should be taken to be the same, because in such case it might be well supposed that the change of expression was introduced through inadvertence. But it appears to me, that the reason for a different intent is obvious. Preferences, though useful to the public, bear hard upon individuals; therefore the greater the extent to which they are carried, the greater should be the caution, to prevent injury to individuals. Where the preference is confined to the case of *deceased debtors*, it has not been usual to pay regard to the time of the debt being contracted, because the debtor has it in his power during his whole life to do justice to each individual, and the creditor who does not press for security has chiefly himself to blame. But the preference is carried much farther, when it is applied to the case of a man, who finding himself in bad circumstances, wishes to divide his property among his creditors equally by a voluntary assignment. This takes away from the debtor the power of doing justice during his life, which he would have enjoyed if the preference were not to attach until after his death. Where such extraordinary priority is intended, it is but justice to inform all the world of it, before it can take effect. When it is known, that a man who becomes indebted to the *United States*, has it no longer in his power to make an equal division among his creditors in case of misfortune, people may at least take care how they deal with a revenue officer or other persons, who have large contracts with the government. And this was the reason why in such cases, the preference of the *United States* was confined to debts contracted after the passing of the act. Such being my opinion on the construction of the law, it becomes unnecessary to consider at what time the debt was contracted.

As to *interest*, it is agreed that the defendant is liable to the same interest, which might have been recovered against the administrators of *Delany*, in an action by the *United States* against them. Now by the twelfth section of the same act of congress, it is expressly enacted, that in case of an action and judgment for the *United States* against a revenue officer, for money received by him, and not paid into the treasury, interest at the rate of six per cent. per annum shall be recovered, from the time of receiving the

money until it shall be paid into the treasury. In this case, I understand the attorney for the *United States*, offers to take the interest from the time *Sharpe Delany* went out of office, which is putting the matter upon as favourable a footing for the defendant as the law will permit. It was urged for the defendant, that there ought not to be interest for any time before the commencement of the action, because the money could not legally be paid without a warrant from the treasury, and no warrant was drawn. It is very clear that this was not the reason why payment was delayed. The administrators of *Delany* were never prepared to pay, and have received considerable indulgence. But although it may be necessary for a warrant to be issued, before money is received in the treasury, in order that the secretary of the treasury may be exactly informed of the state of the treasury, yet that is a matter between the officers of government. I am satisfied, that in practice, payments are made by the debtor without warrant, and such payments would no doubt be held good. I am therefore of opinion, that interest should run from the time that *Delany* went out of office.

YEATES J. I adhere to the opinion which I delivered on the trial of this cause, and of which copies have been furnished. I will not repeat the grounds on which my judgment was then formed, on the true construction of the fifth section of the act of congress of 3d *March* 1797, as to the priority claimed by the *United States* in the payment of the debts of a deceased revenue officer. Upon the fullest reflection, I cannot perceive any intention in the legislature, that the word *hereafter*, used in the first part of the section as applicable to a living debtor, should be interposed in the succeeding part, to meet the case of a deceased debtor. The two members of the section are distinct and independent. It has been urged that this provision, in the sense in which I understand it, is retrospective in its operation, and tends to defeat the vested rights of other creditors. I am at a loss to conceive such vested rights, because the right of priority forms no part of the contract itself, but is extrinsic, and depends on the *lex loci*. 5 *Cranch* 299, *Harrison* v. *Sterret.* If however, we should allow weight to the remark, it would

equally apply to all laws, directing the order of payment of the debts of persons deceased. By our old act of 4th *August* 1705, debts due to the queen were to be paid after physic and funeral expenses, and judgment creditors were postponed to the proprietary and governor. The act of 19th *April* 1794, *3 Dall. State Laws* 527, institutes new provisions; but both those laws evince that preferences of different creditors of a deceased debtor, were not deemed unreasonable or unjust. In neither of them is there any discrimination between the debts contracted before or after the passing of those laws.

Should I however, have been mistaken in my construction of the act in question, what will be the result? I neither formed nor delivered any opinion to the jury, whether the whole or any part of the 67,821 dollars 31 cents, found as a balance against the estate of *Sharpe Delany*, became due after or before the passing of the law. In my view of the case it was wholly unnecessary, and therefore in my statement of the facts, under the special agreement of counsel, I thought it more correct to submit it to the decision of the Court.

It appears by the evidence, that the balance of cash remaining in the hands of the said *Sharpe Delany*, according to the quarterly settlements, made by the comptroller up to the 31st of *March* 1797, (which was twenty-eight days after the passing of the act of congress) was $ 102,262 73
A like balance of cash for the quarter ending
    the 30th *June* 1797, - - - 130,918 19
A like balance of cash for the quarter ending
    the 30th *September* 1797, - - - 83,020 23
A like balance of cash for the quarter ending
    the 31st *December* 1797, - - - 86,322 80
A like balance of cash for the quarter ending
    the 31st *March* 1798, - - - 96,952 19
And that upon a final settlement up to the
    30th *June* 1798, there remained a balance
    due from him to the *United States* of - 67,821 31

The duties of the several collectors are pointed out by the act of congress of 4th *August* 1790. They are authorized to receive the public duties and imposts, and to pay the drawback on goods exported; and for this latter purpose,

they retain such monies in their hands as they may judge adequate. They are charged with the different quarterly balances of the monies unpaid, and account for those sums from time to time. Should the comptroller conceive from the documents in his office, that a larger sum is retained in the hands of the collector, than in all probability will meet the public exigencies, it becomes his duty to give an order that the supposed excess be paid into the public treasury. But while the floating balances varying from time to time, according to the imports into, and exports from the *United States*, remain in the hands of the collector, specially appropriated to the payment of the drawbacks, he cannot with any propriety be considered as indebted to the Union in these several sums, but is accountable therefor. His successive payments of drawbacks must be supposed to be made out of his quarterly balances, and new amounts are raised against him, enlarging and diminishing those balances according to the extents of imports and exports. In this view of the case therefore, I think *Sharpe Delany* became indebted to the *United States* for the 67,821 dollars 31 cents after 3d *March* 1797.

The act of congress of 3d *March* 1797, supersedes the provisions of our act of assembly of 19th *April* 1794, as to the priority claimed by the *United States*, and must govern in this instance, as the paramount law. The condition of the administration bond is, that the administrator shall pay over according to law.

I am also constrained to say, that the want of a warrant in this instance to pay over the sum due to the treasury, will not excuse the administrators from paying interest. The money was demanded by a suit, and a payment therein would fully have discharged the administrators.

BRACKENRIDGE J. By article 7th *of amendments to the Constitution of the United States*, *March* 4th 1782, it is provided that "private property shall not be taken for public use "without just compensation." Does this act of *March* 3d 1797, *sec.* 5. take away "private property for public use with-"out just compensation?" No *compensation* is pretended, and what compensation could there be but the thing taken away? For it is in kind the same; and a compensation to be just,

must in this case be the same with that taken away. Money for money. It is a *private debt* that is to be taken away, to satisfy a *public* debt; a debt to a citizen, to let in a debt due to the public. Is not this taking away " private property for " public use?" Let us analyze this a little, and see whether a debt due to me, is not *my property as much as any other interest.*

On credit given by one individual to another, he acquires an interest in the debt. It is immaterial whether the foundation of the credit has been goods sold, or money lent. He has just as good a right to the debt due, as he had to the property before he parted with it. He has a right to recover the consideration according to the contract, just as he had before to retain that property on which the consideration had arisen. A contract for services performed, or to be performed, stands upon the same ground. He had a right to withhold his services before the contract, and having performed these, in consideration of the thing contracted for, he has a right to that thing. His right to recover the compensation, is as perfect as a right to any claim of property not in his possession. In common understanding, the debtor is worth so much less by the debt which he owes. If so, the thing subtracted must be in him to whom he owes; hence we say, if all his debts are paid the man is worth nothing. In justifying bail we consider the surety as worth only so much as he swears to, over and above his debts. In whom is the interest in the drawback, but in his creditors? This is the language of the civil law, *L.* 49, *tit.* 14. *sec.* 11. *Id enim bonorum cujusque esse intelligitur, quod æri alieno superest.* A man is worth just so much as is over and above his debts paid.

The civil law knew nothing of a priority of payment in favour of the public. For in this same book, and under this same title, it is laid down, that a question having been made by a civilian, whether in the case of an insolvent, the goods should go to the public, it was established to the contrary. *An bona quæ solvendo non sint ad fiscum pertineant, quæsitum est?* Labeo *scribit, etiam ea quæ solvendo non sint, ipso jure ad fiscum pertinere. Sed contra sententiam ejus edictum perpetuum scriptum est, quod ita bona veneunt si ex his fisco adquiri nihil possit.* The goods of an insolvent are to be sold, even in a case where the fisc

1814.

COMMON-
WEALTH
*v.*
LEWIS.

or treasury can get nothing from thence. For *non possunt ulla bona ad fiscum pertinere, nisi quæ creditoribus superfutura sunt.* The treasury can have no property in that but what remains after paying creditors. And again, *omnium fiscalium pænarum petitionem creditoribus postponi.* All claims on account of revenue are to be postponed to creditors. As between citizen and citizen where debts are in *æquali jure*, on ground of natural equity a *prorata* satisfaction must take place. The common law speaks of a debt of a higher nature, that is a debt by higher evidence of obligation; and this may be all fair, for it was in the power of the party contracting, to make his debt of a higher nature by this evidence; or if in the nature of the contract it could not be made so, it was an incident to the nature of it. This is all equal, and there is no robbery in the case. But if a debt due to me is property, it is a robbery to deprive me of it. Can the common or enlightened mind feel any difference between the taking away of my estate, and the right to recover that for which I may have sold it, and which remains due? My demand is taken away, not on the ground of being a debt of a higher nature, either from the higher evidence or the nature of the consideration, moral or legal, but a debt due to the whole instead of a debt due to one. Why shall the payment of a debt due to one, be postponed to a debt due to the whole? The public is said to have a broad back, and one would suppose that the whole could afford to bear a delay or a loss, better than an individual. What would be a small matter divided among many, might be ruin to a private person. Doubtless it might be made a principle in the foundation and original compact of the society, and in that case there could be nothing to be said. A regulation against natural equity might be sustained by such compact or understanding, for the body politic would have sanctioned and admitted it. But independent of compact or tacit acquiescence, can it be just? It is against natural equity that a part should bear a loss to ease the whole. Why shall an individual contribute more than his proportion of the loss? Does he not bear his proportion, when he comes to be called upon in common with the other citizens to pay his quota by way of tax, to make up for a delinquency in a particular case? I call it robbery to take away his debt due to him,

over and above this. It is not robbing *Peter* to pay *Paul*, but it is robbing *Peter* to pay *Paul* and *Peter's* club. The whole ought to pay the club, and *Peter* only his proportion of the share.

Whether of feudal origin, or how it came into existence, I cannot here undertake to investigate; but I admit that this priority in the payment of public dues, is a prerogative of the sovereign in *England*. But was it carried with us in our colonization? In this colony, *Pennsylvania*, it would not seem to have been thought so; for by acts of assembly 1705, 1710, 1764, preference to a certain extent was given to the Commonwealth, which goes to prove, that it was not thought to have a preference by the *British* prerogative of the common law introduced here. But the Commonwealth, being the whole people, and subject to no control of a higher law, may be said to have had the same power to introduce such a principle as at the first formation of a society; at least, enacted by the representative, and acquiesced in by the people, it amounted to the same thing as if originally established in the compact of the society, and acquired the force of a legitimate principle. It might be retained, altered or modified, according to the expediency and reason of the rule. Accordingly by act of assembly 1794 it is altered, the principle is changed, and it is provided that the Commonwealth shall be postponed to a debt due to a private person; and so far from claiming a priority, or even a *pro rata* satisfaction in the case of a debt *æquali jure*, it shall be last paid. Not that I contend for such postponement, but that the whole shall be put upon a footing with an individual, and that in case of debts of an equal nature, the *prior in tempore potior in jure* shall prevail; but it shews the sense of the community, that where a loss must be sustained, it is reasonable that the many shall bear it rather than the few.

It may have been the provision of the *state constitution of* 1790, *August* 9th, that no man's property shall be taken or applied to public use without just compensation being made, that may have led to this repeal or modification of the former law, in the case of the prerogative claim of priority of payment on behalf of the Commonwealth. But the power of the state to provide in this case, stands upon a footing totally different from that under the federal compact, either

as to giving the whole a priority, or regulating priority among individuals. Under the federal constitution, *no power can be exercised that was not expressly given, or to be inferred by necessary implication.* These powers were hewn out of the power originally in the people of the several states. The congress had not even the power of the people of each several state, if any, state consistent with natural equity could have given itself a priority in the payment of public dues. The federal government was but in the nature of a restricted authority. The framers of the constitution thought it not necessary to specify reservations or give a bill of rights. Some of these, which were thought unnecessary, were however passed, on objections taken to the frame of the federal government, and afterwards brought forward as amendments to the constitution, more I take it to reconcile opposition than because they were necessary. For who would ever have thought it necessary that there should be such an express stipulation, as " that private property shall " not be taken for public use without just compensation?" *Article 7th of amendments, March* 4th 1789. It could not but be understood, that as an incident to the general government, the exercise of the *dominium eminens* must exist, so far as respected the taking or occupying grounds for the purpose of national defence or for great public utility, and this as an incident could not but be supposed to carry with it also the obligation to compensate for the soil, or for the use according to a just valuation. The taking property otherwise, was never dreamed of, and therefore no provision made. Nor do I believe that under this amendment, any other case was thought of, than the taking such property for permanent or temporary use, as that to which the *dominium eminens* was always and under all governments considered as extending. But independent of implied power in the general government, or power incident to the exercise of the supreme authority, the providing for the common defence and general welfare of the *United States*, as in section eighth of the constitution, and the power to make all laws which shall be necessary for carrying into execution the foregoing powers, must be considered as expressly giving the exercise of the *dominium eminens* in all matters known to be the subject of it; and this upon compensation made.

. But even this exercise of the *dominium eminens* is restricted, and it must be a purchase " by the consent of the " legislature of the state, in which the same shall be, that " *forts, magazines, arsenals, dock yards, and other needful* " *buildings shall be erected.*" A purchase implies consideration. The taking private property for the purpose of increasing public funds was never thought of, though doubtless it must be said not to be included in the prohibition.

But it will be said, the general government is charged with the raising and supporting armies, and with providing and maintaining a navy, and in doing this debts must be incurred. But by *article* 1. *sect.* 8. the congress are empowered to lay and collect taxes, duties, imposts, and excises, to pay the debts. Is any thing more than this necessary to pay debts? It will be alleged, and would seem to be implied by this act of *March* 3d 1797, that it is necessary to go farther. The congress that enacted it have doubtless thought so. But had they a right to think so, at least to enact it? Was it necessary to go that length as to the recovery of debts that might be due? When the general government has any thing to dispose of, it can have the *quid pro quo* paid down before it parts with the property. If a trust is given in receiving dues, there is no scarcity of persons offering to accept an office, and security can be obtained, even if the persons offering are not of themselves of great estate, so as to secure against a delinquency; so that in the original contract to perform any thing, the public have all the means of securing themselves that an individual has, and why should it want more? An honest individual has his debts to pay too, and why take from him the means, by taking away *the debt that is due to him*, or lessening it, by the *United States* paying themselves the whole of their debt in the first instance? Had the act gone no further, than that in case of credit given to a revenue officer, *after becoming* such, the debt should be postponed to that of the public, there would be less to be said. I should have no objection to the having it understood, that on credit given to a *revenue officer* or other *public agent*, it should be at the risk of the person giving the credit. This might be all fair, there would be notice. He gave the credit with his eyes open, and at his own risk. I might perhaps submit to the same law

1814.

COMMON-
WEALTH
*v.*
LEWIS.

with regard to a credit given after *suit brought*, against any person not a revenue officer, because in this case there would be a kind of notice of which the law speaks, *a constructive notice.* There would be something to save appearances in this, and it would not be just so barefaced as it stands under the act of *March* 3d 1797; that is, that the appointment of a revenue officer, or the contracting by the public with *any person*, should immediately make him a new man, and wipe away all antecedent scores, so far at least as to let in public claims, subsequently arising, to be first paid. For it is in the act of congress, "other persons becoming indebted;" and hence it is, that though an individual might guard against crediting a public officer after notice of his being such, yet it would be impossible to anticipate the will of congress in creating an agency, or the president in appointing to that trust. Even such a constructive notice from a suit brought by the *United States*, would work sufficient hardship, from the difficulty of obtaining actual knowledge by inspecting dockets at a great distance. When any individual of the community, offers to contract and take credit, there is no putting him to his oath, whether he owes any thing to the public, or whether a suit has been brought against him. But if he was put to his oath, it is not what he owes, but what he might come to owe, or have a suit brought against him for, that is to be considered. The person crediting might demand security from the person credited, that he never would owe any thing, or have a suit brought against him. In the nature of the case this is all that could be done.

But it will be said the wisdom of the great council of the nation has enacted the law, and the presumption is, that it is constitutional. I grant the presumption does arise; but it is weakened not a little, when the nature of a representative government is taken into view. The representative to keep his place must preserve his popularity, and all is odious that sounds in *tax.* Whatever therefore will be in ease of a direct application to the pockets of the whole, there is a temptation to adopt; so that it is not altogether the wisdom or justice of public measures, but the self preservation of the representative, that is in question, when a vote is given.

But the judiciary are the guardians of the constitution,

and it is a presumption in favour of the law that they have not questioned it. It is doubtless the presumption, but it is not conclusive. And having a right to question it, and my reason so directing, I must bear testimony against it. Doubtless such protest cannot carry great weight with it, but it may weigh, and in due time work to some effect: However humble the source from which reason may come, it may ultimately be heard and prevail.

Judgment for the plaintiff.