**MONTGOMERY, Superintendent of Banks,**

**et al. v. WARD.**

**4 Div. 712.**

Supreme Court of Alabama.

Dec. 21, 1933.

B. W. Smith, of Samson, for appellants.

Carmichael & Tiller, of Geneva, for appellee.

**KNIGHT, Justice.**

Bill by F. J. Ward, appellee here, against the Farmers' & Merchants' Bank of Samson, and H. H. Montgomery, as superintendent of banks of the state of Alabama, in charge of the liquidation of the said Farmers' & Merchants' Bank, seeking subrogation to the right, claim, and lien of the state and the county of Geneva against the properties of said bank, on account of certain tax moneys of the state and county deposited in said bank by the appellee, while acting as tax collector of Geneva county.

The material facts averred in the bill may be stated as follows: the appellee, during the month of November, 1929, was the tax collector of Geneva county; that on the 15th day of said month he collected taxes from the taxpayers of said county to the amount of $468.44,—$144.99 of which amount belonged to the state, and the balance, $323.45, was tax money of the county. This money, state and county, the said Ward deposited in said bank on the 16th day of November 1929, in a "separate and special account in the name of F. J. Ward, as Tax Collector"; that said bank was not a designated depository for either state or county funds, and had not executed to the said tax collector "any bond to indemnify him, as such Tax Collector, against any loss which he, as such Tax Collector of the State of Alabama and the County of Geneva might sustain as a result of said State and County funds being deposited in said bank." The bill also contains the following specific averment: " * * * That said officers of said bank knew at the time the said deposit was made that said sums belonged to the State and Geneva County and received them as such; that the action of the said bank in receiving said sums of money was in violation of the law and constituted an unauthorized acceptance of a deposit, in that no bond had been executed by said bank as provided by law and as hereinabove averred," etc.

It is further averred that on November 29, 1929, the said bank closed its doors, and went into the hands of the superintendent of banks for liquidation, and that it is now in process of liquidation. It is further averred that the said Ward, before the filing of the bill, recognizing his liability, had paid, out of his individual funds, to the state and county, the amount of tax money so deposited by him in said bank; that he had made demand on the said superintendent of banks for said money, but that his demand had been refused, and that he was forced to pay the money to the state and county. It is also averred that the bank had in "its till and in solvent banks cash to the amount of, to-wit, $5,000.00, and that the said bank had in its till and in solvent banks at the time it closed its doors on November 29th, 1929, upwards of, to-wit, $6,-000.00." It is also averred that, in said sum of $6,000 in cash so on hand and turned over to the said superintendent of banks as assets of the said Farmers' & Merchants' Bank of Samson, there was included the sum of $468.-44 so deposited by the complainant, as tax collector aforesaid; that said bank was to hold said funds for him as tax collector in trust, said bank knowing full well that said funds belonged to the state of Alabama and the county of Geneva. Notwithstanding the last stated averment, that the bank was to hold said funds in trust for complainant as tax collector, the bill further specifically averred: "That on November 16th, 1929, the complainant went to Samson to collect state and county taxes; that J. B. Pinckard and W. M. Wise, who were President and Vice President respectively of the Farmers & Merchants Bank of Samson, the said W. M. Wise also acting as Cashier, prepared for the complainant an office in the Farmers & Merchants Bank of Samson, which said office was to be used and which was used by the complainant in and about the collection of State and County taxes; that said officers of said bank, prior to that time, prepared said office and invited your complainant to use it whenever he was in Samson on official business and in and about the collection by him of State and County taxes; that the complainant, *in appreciation of the courtesy of the officers of said bank, and by way of compensating the bank for its trouble in his behalf as hereinabove averred, agreed with the officers of said bank that he would deposit in said bank to his credit as such Tax Collector the State and County taxes which he collected during the days he used the office in said bank as hereinabove averred.*" (Italics supplied.)

Having paid to the state and county the amount of tax money deposited with said bank, the complainant prayed to be subrogated to the lien of the state and county against the properties of said bank, and for the enforcement of said lien by proper decree of the court.

The respondent Montgomery demurred to the bill, and, from the decree of the court overruling his demurrers, prosecutes this appeal.

As we see it, the complainant, in the statement of his case, has stated himself out of court, under one of plainest principles of equity jurisprudence.

The demurrer of the respondent takes the point, and aptly so, that the complainant, in seeking equitable subrogation to the right and lien of the state and county, shows upon the face of his bill that a wrong was perpetrated upon both the state and county when, under the circumstances disclosed by the bill, the funds of the state and county were deposited by the complainant in the Farmers' & Merchants' Bank of Samson; that the act was in violation of law, a conversion of public revenue, and that the complainant participated in this wrongful and unauthorized act.

The demurrer aptly points out that the complainant, under the facts averred in the bill, does not come into court with clean hands.

Equity will not lend its aid to one in his effort to extricate himself from the hurtful consequences of an act, deliberately committed, in violation of law, and in disregard of a duty solemnly enjoined by statute. The equitable maxim that he who comes into equity must come with clean hands has been rigidly applied in all such cases, and relief uniformly denied. While we deem it unnecessary to review, or to collate, the authorities sustaining this proposition, yet we will refer to a few of them.

In 21 Corpus Juris, § 163, the principle is thus stated in the text: "The maxim that he who comes into equity must come with clean hands, or, as it is frequently expressed, that he who has done iniquity shall not have equity, or that he who has done inequity, or has not done equity, cannot have equity, is of ancient origin, and broad application. It is the expression of the elementary and fundamental conception of equity jurisprudence; and, although not the source of any distinctive doctrine, it furnishes a most important and universal rule affecting the entire administration of equity jurisprudence as a system of · remedies and remedial rights. This maxim expresses rather a principle of *inaction rather than one of action*. It means that equity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct," etc. (Italics supplied.)

In the case of Ashe-Carson Co. v. Bonifay et al., 147 Ala. 376, 383, 41 So. 816, 819, it was observed: "It is a fundamental principle of equity, that he who seeks equity must do equity, and he who comes into equity must come with clean hands. 'Whenever a party, who, as actor seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' 1 Pom. Eq. Jur. (2d Ed.) §§ 397, 399."

And in the case of Galliland et al. v. Williams et al., 181 Ala. 173, 178, 61 So. 291, 293, which was a case involving a cancellation of a mortgage, *and subrogation*, this court, in passing upon the question of subrogation presented in the case, observed: "It is generally accepted that one who seeks the benefit of the equitable doctrine of subrogation must come into court with clean hands; that a vendee cannot have relief under the doctrine if *his status is the result of his own wrongful act, or of a wrongful act in which he participated*, or of the wrongful act of one under whom he claims. Sheldon on Subrogation (2d Ed.) § 44; Boyer v. Bolender, 129 Pa. 324, 18 A. 127, 15 Am. St. Rep. 723; Johnson v. Moore, 33 Kan. 90, 98, 99, 5 P. 406; Rowley v. Towsley, 53 Mich. 329, 339, 19 N. W. 20; Milwaukee & M. R. Co. v. Soutter, 13 Wall. 517, 523, 524, 20 L. Ed. 543; Farmers' Loan & Trust Co. v. Carroll, 5 Barb. (N. Y.) 613, 660; Wilkinson v. Babbitt, 4 Dill. 207, Fed. Cas. No. 17,668. * * * That the 'doctrine of subrogation only applies to lawful and meritorious transactions.'" (Italics supplied.)

We have heretofore said that the complainant, in the statement of the facts of his case, has stated his case out of court. This was said, because it is apparent that the complainant, on the face of his bill, makes it clear and certain that he presents a case which falls squarely within the condemnation of the equitable principles above stated, and which are supported by the holdings of many courts of last resort, including our own, as well as by text-writers.

In his bill, complainant avers: "That the said officers of said bank knew at the time the said deposit was made that said sums belonged to the State and Geneva county, and received them as such; that the action of said bank in receiving said sums of money was in violation of the law and constituted an unauthorized acceptance of a deposit, in that no bond had been executed by said bank as provided by law and as hereinabove averred." The deposit, under the averments of the bill, by the complainant of the funds of the state and county of Geneva, was

wholly unauthorized and constituted a conversion of such funds. Montgomery, Superintendent of Banks, v. Sparks, Tax Collector, 225 Ala. 343, 142 So. 769. The action involved a wrong committed against the state and county, not only by the officers of the bank, but by the complainant, himself. For, if it was a violation of the law to receive the deposit, it was likewise equally a violation of the law for the complainant to make the deposit. The officers of the bank and the complainant stand in pari delicto. In these circumstances, a court of equity will not lend its aid to the complainant in his effort to extricate himself from the consequences of a wrongful act, in which he confessedly participated. The door of a court of equity must, under the plainest principles, remain closed to him. It only remains to be said that the case made by the bill falls within the class to whom equity will not accord subrogation. And it may be added that the averments of the bill do not entitle him to any other relief.

When the court below first considered the case on the demurrer of the respondent Montgomery, the demurrer was sustained, but, on a subsequent day, the judge of the court became convinced that, in sustaining the demurrer, he ran counter to the decision of this court in our recent case of Montgomery, Superintendent of Banks, v. Sparks, Tax Collector, 225 Ala. 343, 142 So. 769. In this the learned judge was in error. In the Sparks Case, funds of the state and county of Clay, without authority of law, had been deposited in the Farmers' State Bank by the tax collector, Sparks. The bank failed before these funds were paid over to the state and county. The bank was not a designated depository. The suit against the bank was by the state, for the use of itself and Clay county, and was joined in by said Sparks, as such tax collector, suing for the use of the state and Clay county. In that case, we held that the state and county had a preferred lien upon the assets of the bank to the extent of the funds deposited in the bank by the tax collector. This conclusion was reached upon the theory that the unauthorized or unlawful deposit of public funds in a bank which subsequently becomes insolvent created a trust relationship in such funds between the bank and the community to which they belong, and that the lien of the state for the payment of the trust fund attached to all assets of the bank as a preferred claim. No doubt we would so hold in this case, if the suit was by the state seeking to establish a lien upon the assets of the bank; but the state and county have been paid. The real parties in interest in the Sparks Case were the state and county of Clay; they were the usees. Sparks was a mere nominal party. We did not hold in the Sparks Case that Sparks, in his own right, could have prosecuted the suit, had he, prior to filing the suit, paid to the state and county the moneys so wrongfully deposited in the bank. The Sparks Case was one in which the state and county, in their own right, sought to enforce a lien upon the assets of the insolvent bank; while in the present suit, the tax collector, having made payment to the state and county, and thereby discharged his primary obligations, seeks subrogation. This he cannot have, for, to grant him such relief, he must set up his own wrongful and unlawful act.

The appellee brings to our attention the cases of Schuessler v. Dudley, 80 Ala. 547, 2 So. 526, 60 Am. Rep. 124, and Singleton et al. v. United States F. & G. Co., 195 Ala. 506, 70 So. 169, as authorities sustaining his position that the tax collector can assert in the case the right to subrogation. Appellee overlooks the fact that in the Dudley Case it was the surety who, after paying the judgment rendered against the defaulting tax collector, sought subrogation. Confessedly, the surety came into court with clean hands, asserting a clear equity.

The same equitable principle which closes the door of a court of equity to the complainant in his assertion of the right to equitable subrogation also precludes him from asserting a preferred lien against the assets of the bank. Confessedly, the money actually deposited with the bank was money of the state and county of Geneva, not complainant's funds. In order to establish any lien upon the assets of the bank, the complainant would be compelled to show the transaction giving rise to the asserted equity, and this would disclose complainant's unauthorized deposit of the state's and county's money in said bank.

It follows that the court below committed error in overruling the demurrer of respondent Montgomery, as superintendent of banks, to the bill of complaint. The demurrer should have been sustained. A decree will be here entered sustaining said respondent's demurrer.

Reversed, rendered, and remanded.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.