153 So. 394
**MONTGOMERY, Superintendent of Banks, v. STATE et al.**
**8 Div. 567.**

Supreme Court of Alabama.
March 1, 1934.

Rehearing Denied March 22, 1934.

J. G. Rankin, of Athens, for appellant.

Steiner, Crum & Weil, of Montgomery, amici curiæ.

R. B. Patton, of Athens, for appellees.

KNIGHT, Justice.

It is made to appear from the petition in this cause that B. S. Turrentine, the clerk of the circuit court of Limestone county, had at sundry times deposited in the Farmers' & Merchants' Bank, Athens, Ala., public moneys of the state of Alabama and of Limestone county, as well as certain fees of officers of the court, unclaimed witness fees, and moneys paid to him by individual litigants to secure court costs in pending suits; that, while a large part of each of said funds was still on deposit in said bank, the institution became insolvent, closed its doors, and its affairs were duly turned over to the appellant, as superintendent of banks, for liquidation.

It appears both from petition and the evidence offered on submission that at the time the bank closed its doors, and went into the

hands of the superintendent of banks for liquidation, there was on deposit in said bank, to the credit of Mr. Turrentine in his official capacity, the following items, to wit:

| | |
|---|---|
| State Trial Taxes | $172.63 |
| Solicitor's Fees | 134.00 |
| Court Reporter's Fees | 118.67 |
| Unclaimed Witnesses' Fees | 648.71 |
| Fines collected in Criminal Cases | 394.92 |
| Fees due other officers and collected by the Clerk | 321.60 |
| Courts Costs advanced by non-resident Litigants | 72.50 |
| Fees collected as Circuit Clerk fees for Circuit Clerk | 54.78 |
| **Total** | **$1917.81.** |

It appears also from the petition and the agreed statement of facts that the said Farmers' & Merchants' Bank was a banking corporation doing business as such under the laws of Alabama, in Limestone county, at the time the moneys were deposited with it by the said Turrentine, as such clerk; that said corporation became insolvent and closed its doors, and its affairs were turned over to appellant for liquidation on or about December 13, 1931; that said bank was not a designated depository, and had given no bond for the safe return of the funds as provided by section 3973 of the Code. It is also averred and admitted "that the officials of said bank knew that said funds were public funds," collected and paid over to said Turrentine in his official capacity.

The court overruled respondent's (appellant's) demurrer to the petition, and rendered a final decree, ordering and adjudging that the claim of complainants (except the items of $321.60 due officers of Limestone county, $72.50 due nonresident litigants, and $54.78 clerk's fees) was a preferred claim against the assets of said bank, and was entitled to be paid as such.

■■ It will be noted that B. S. Turrentine, not as an individual, but in his official capacity, appears as a party complainant with the state of Alabama and Limestone county. One ground of demurrer takes the point that, inasmuch as the money was deposited in said bank by said Turrentine, and the petition alleges the deposits were wrongful, the said Turrentine cannot be allowed to profit by his own wrongful act, and therefore cannot recover in the suit. If the suit was by Turrentine seeking relief for himself, unquestionably he could not maintain it, if he had wrongfully deposited the funds in the bank. Such was the holding in our recent case of Montgomery, Sup't of Banks, et al. v. Ward, 151 So. 583. But, in this case, Turrentine is suing for the use of the state of Alabama and Limestone county. The uses are therefore the real and only beneficial parties complainant. And, besides, no relief was granted Turrentine, as the court declined to allow a recovery for the clerk's fees, and the money deposited by him which was not public funds. Therefore, if it was error to overrule the demurrer, it would be error without injury, and in the conclusion we here reach it was error without injury.

On this appeal, the appellant has filed two comprehensive briefs attacking the soundness of our conclusions in the cases of Green v. City of Homewood, 222 Ala. 225, 131 So. 897, and Montgomery v. Sparks, 225 Ala. 343, 142 So. 769. Accordingly, we are invited to review these authorities, with a view to overruling them, if we are now convinced of their unsoundness.

■ It is earnestly insisted, and, we may add, with much force, that, if the state of Alabama ever possessed the sovereign prerogative to preferential right of payment out of an insolvent debtor's property under the principles of the common law, in virtue of its sovereignty, that right, *if in fact it ever existed*, has been waived or abrogated, and no longer exists because of the general trend of both constitutional and statutory enactments in this state extending over a long period of time.

By statutory enactment of this state the "common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this State, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the legislature." Code, § 14.

No one, we assume, will doubt for a moment that the British Crown enjoyed the prerogative right to priority of payment out of the properties of an insolvent debtor, as against all persons not having prior liens. This right was regarded as an attribute of the Crown. Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 144, 65 L. Ed. 315; In re Carnegie Trust Co., 206 N. Y. 390, 99 N. E. 1096, 46 L. R. A. (N. S.) 260; United States Fid. & Guar. Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A. L. R. 829; People of State of Ill. v. Farmers' State Bank of Hooppole et al., 335 Ill. 617, 167 N. E. 804, 65 A. L. R. 1327.

In the case of Marshall v. People of New York, supra, Justice Brandeis, in speaking for the court, observed: "At common law the

crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due it. The priority was effective alike whether the property remained in the hands of the debtor, or had been placed in the possession of a third person, or was in custodia legis. The priority could be defeated or postponed only through the passing of title to the debtor's property, absolutely or by way of lien, before the sovereign sought to enforce his right. Giles v. Grover, 9 Bing. 128, 139, 157, 183; In re Henley & Co., 9 Ch. D. 469."

And in the early case of the United States v. State Bank of North Carolina, 6 Pet. 29, 35, 8 L. Ed. 308, Mr. Justice Story, speaking for the court, said: "The right of priority of payment of debts due to the government, is a prerogative of the crown well known to the common law. It is founded not so much upon any personal advantage to the sovereign, as upon motives of public policy, in order *to secure an adequate revenue to sustain the public burdens, and discharge the public debts*." (Italics supplied.)

The Constitution of the state of New York, adopted in 1777, provided that the common law of England, which together with the statutes constituted the law of the colony on April 19, 1775, should be and continue the law of the state, subject to such alterations as its Legislature might thereafter make. The courts of New York, pursuant to this provision of its organic law, and in virtue of this adoption of the common law, decided that the state, as sovereign, succeeded to the king's prerogative right of priority, and that the priority was not limited to amounts due for taxes, but extended *to all debts due the state*. Matter of Carnegie Trust Co., 151 App. Div. 606, 136 N. Y. S. 466; Id., 206 N. Y. 390, 99 N. E. 1096, 46 L. R. A. (N. S.) 260. As observed by Mr. Justice Brandeis, in Marshall v. People of New York, supra, the priority "has been enforced as a right and not as a rule of administration."

In the case of American Bonding Co. of Baltimore, Md., v. Reynolds (D. C.) 203 F. 356, 357, in passing upon a question involving the right of the state of Montana to priority of payment of debts due to it, Bourquin, District Judge, observed: "The crown's priority over subjects in payment of debts is to secure and conserve the revenues—the life blood of the state, that the latter may be maintained in peace and war and its obligations discharged. It is of the incidental prerogatives and belongs to the king, not as an individual, but parens patriæ, or as universal trustee for the people. It is, in fact, a reservation or exception to the general course of law in favor of the public or for its good. From its nature its origin may be said to be higher than, superior to, and to antedate the common law—of the fundamentals of all government. Its existence is suggested in Magna Charta. * * . *

"Be it as it may, however, I am persuaded there is no escape in reason from the conclusion that by adopting the common law Montana adopted the prerogative rule of priority of public debts." While this case was reversed on appeal by the Circuit Court of Appeals, the reversal was on other ground. Brown v. American Bonding Co. of Baltimore, Md., 210 F. 844.

However, the Supreme Court of Montana, in the case of State ex rel. Rankin v. Madison State Bank (1923) 68 Mont. 342, 218 P. 652, 655, held: "The common-law rule has its foundation in motives of public policy, in order that the state's funds may not be lost, but may be available to meet the expenses of government and discharge the state's obligations." In that state the prerogative right of the state to priority is enforced.

In the state of Georgia, the courts of that state recognize and enforce this prerogative right to priority of payment. Robinson v. Bank of Darien, 18 Ga. 65; Seay v. Bank of Rome, 66 Ga. 609; Booth v. State, 131 Ga. 750, 63 S. E. 502; Central Bank & Trust Corp. v. State, 139 Ga. 54, 76 S. E. 587.

To the same effect are the holdings of the highest courts of the following other states: Iowa, Maryland, Missouri, Oregon, Pennsylvania, Tennessee, Utah, West Virginia, and Wyoming. See, also, United States F. & G. Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A. L. R. 829; Fidelity & Dep. Co. v. State Bank, 117 Or. 1, 242 P. 823; Com., to Use of U. S. v. Lewis, 6 Bin. 266; Booth & Flinn v. Miller, 237 Pa. 297, 85 A. 457; United States F. & G. Co. v. Rainey, 120 Tenn. 357, 113 S. W. 397; Maryland Casualty Co. v. McConnell, 148 Tenn. 656, 257 S. W. 410; National Surety Co. v. Pixton, 60 Utah, 289, 208 P. 878, 24 A. L. R. 1487; Woodyard v. Sayre, 90 W. Va. 295, 110 S. E. 689, 24 A. L. R. 1497; United States F. & G. Co. v. Central Tr. Co., 95 W. Va. 458, 121 S. E. 430.

We are fully persuaded that in adopting the common law of England, in so far as it is not inconsistent with the Constitution, laws, and institutions of this state, we inherited the right of the Crown to priority of payment of debts due the state. The reason

for so holding is so cogent and impelling to our mind that we see no escape from such a conclusion.

We are free to admit that a contrary view is taken by the highest courts in a number of states, and for whose decisions we have and entertain the highest respect. We choose not to follow them, believing that the great weight of authority in the United States is opposed to such holdings. But we cannot follow them, as the decided weight of authority, and, we may add, reason, is against such holdings.

The author of the annotations in 51 A. L. R. 1350, in Re North Carolina Corporation Commission v. Citizens' Bank & Trust Co., makes this observation, in reviewing the decisions of the various state courts on the subject of the state's prerogative right of preference at common law. "The weight of authority sustains the proposition that the several states of the Union, by their adoption of the common law, have succeeded to the prerogative right of the British Crown to priority in payment out of the assets of an insolvent debtor, as against all persons not having antecedent liens; in other words, the state is entitled to a preference over private creditors whose claims stand on the same footing as those of the state."

In the case of Montgomery, Supt. of Banks, v. Sparks, supra, there had been an unauthorized and unlawful deposit of public funds in a state bank; the officers of the bank knew at the time that the depositing of such funds was unauthorized or unlawful, and these funds were commingled by them with the general assets of the institution. In such condition, there can be no doubt but that the state had a prior and superior lien in the nature of a trust upon all the assets of the banks for the payment of the amounts due it. The result reached in that case was right, upon the theory that the trust there declared was in the nature of a lien resulting from the sovereign right of the state, though perhaps the opinion in the case does not clearly assert that as the basis of the trust relationship.

■ It is true that the existence of a wrongful act is not an element in the determination of the sovereign right, but the laws of this state have provided the circumstances when an officer may lawfully make deposit of public funds in banks or other depositories.

We think that, when deposits are thus made, the state has, by such enactments, set aside its sovereign right and right to a preference, and must then depend upon the enforcement of the provisions thereby made for its protection. Provision by law for such security shows an intention to limit its priority to the extent of that security. Without such limitation, the priority extends to the assets indiscriminately. Such could not be held to have been lawfully intended, when by law certain security is required. But, when the deposit is made without legal authority, and without security otherwise required, there is no legal enactment which shows a purpose to limit its sovereign right to a preference, so that there is then no evidence of a waiver of such right to any extent.

This is not because the wrongful act is necessary, or an incident to the sovereign right, but, when it is wrongful, and not otherwise secured as provided by law, there is no reason to infer that the state has divested itself of its sovereign right to a preference.

■ This theory is wholly distinct from the enforcement of a trust not based upon sovereign right. A trust not based upon such sovereign right may, or may not, exist, dependent upon the fact that the deposit is not only wrongful but also that the funds are traceable. But, when it is rested upon sovereign right, it is not dependent upon the ability to trace the funds.

We think the above distinction is clearly pointed out in our case of Green, Supt. of Banks, v. City of Homewood, supra.

It is earnestly contended that, should it be held that the state enjoys the sovereign right to preference and priority, in the payment of debts due it by insolvent debtors, notwithstanding the trend of our legislation—constitutional and statutory—the counties never had, and do not have, any such right.

We are free to admit that the question of whether the sovereign right of the state to preference extends to, and is enjoyed by, the several counties, is one upon which there is greater contrariety of holdings in the several states of the Union than there is upon the question of the state's right to such preference. A proper solution and determination of the question depends largely upon the legal status of a county—whether it is a separate political entity, or whether it is merely a political subdivision of the state, created for the purpose of aiding the state in the administration of the affairs of the state. If it is a separate political entity, it would seem that it would not possess the sovereign right to preference in the payment of debts due it by insolvent debtors, because

there can be no two sovereign rights in the same territory. But, in the last analysis, the question really to be determined, Is. the money collected in and by a county, moneys of the county, or in law moneys of the state?

What is a county? Chief Justice Brickell, in the case of Askew v. Hale County, 54 Ala. 639, 25 Am. Rep. 730, observes: "It [county] has corporate characteristics, but it is not a municipal corporation, though often so termed. It is an involuntary political or civil division of the State, created by statute to aid in the administration of government. It is in its very nature, character and purposes, public, and.a governmental agency, or auxiliary, rather than a corporation. Whatever of power it possesses, or whatever of duty it is required to perform, originates in the statute creating it. It is created mainly, for the interest, advantage, and convenience of the people residing within its territorial boundaries, and the better to enable the government to extend to them the protection to which they are entitled, and the more beneficently to exercise over them its powers. All the powers with which the county is entrusted, are the powers of the State, and all the duties with which they are charged, are the duties of the State. If these were not committed to the county, they must be conferred on some other governmental agency. The character of these powers, so far as counties in this State are concerned, are all for the purposes of civil and political organization. The levy and collection of taxes, the care of the poor, the supervision and control of roads, bridges and ferries, the compensation of jurors, attending the State courts, and the supervision of convicts sentenced to hard labor, as a punishment, for many violations of the criminal law, it is the general policy of the State to entrust to the several counties, *and are all but parts of the power and duty of the State.* These powers could be withdrawn by the State, in the exercise of its sovereign will, and other instrumentalities or agencies established, and clothed with them." (Italics supplied.)

In the case of State v. Brewer, 64 Ala. 287, it was held: "The taxes levied for county purposes, while in process of collection, or after collection, may be withdrawn from the county, or from its treasury, and *appropriated as the legislature may direct.* There can be no ground for complaint—the State is not dealing with an individual, nor with a corporation, having or claiming adverse rights. It is simply in the pursuit of its own policy, adapting that policy to public necessities and exigencies, as may be deemed most promotive of public rights and interests." (Italics supplied.)

This statement was quite recently reaffirmed in the case of Board of Revenue and Road Com'rs of Mobile County et al. v. Puckett, 227 Ala. 374, 149 So. 850.

So, after all is said and done, county funds are in reality state funds, subject to state control, and no part of which can be expended by the county without express or implied authorization by the state. Should the governing board of a county expend the county funds, or any part of the same, except in cases, and for purposes, authorized by the state, they would be civilly liable therefor.

In the case of Leach v. United States Bank, 205 Iowa, 987, 213 N. W. 528, 530, it is said: "A county is a subdivision of the state, and owes its creation to the state. It is an arm of the state, and subject to the control and direction of the state, and, in the instant matter (matter involving the same questions now before us), the county's rights must be and are wholly worked out on the theory that it is a part of the state."

It is not, as supposed by learned counsel for appellant, a case of having two sovereigns in one and the same territory, or jurisdiction. There is but one sovereignty—the state—but that sovereignty extends to every county in the state. For all practical purposes—the effective governmental operation of the state and every political subdivision thereof—there is but one sovereignty, and whatever affects the revenues of the several political subdivisions of the state directly and immediately affects the state. It is a false idea to assume that the county is a separate entity from the state, that its revenues belong exclusively to the county, and are under its absolute control. Such revenues belong to the state, and may be appropriated by the state.

In such circumstances, we cannot subscribe to any doctrine which would recognize a right in the state to claim preference in the payment of moneys that must, in the first instance, come to Montgomery, but withhold the right to enforce preference in cases where the money, in the first instance, must be paid into a county treasury, but still subject to the will of the state, and in fact the state's money. Whether we are in accord with the majority holding in the several states on this question or not, we feel that our conclusion is sound and in keeping with our theory of government—state and county.

We hold, therefore, that the state's sover-

eignty extends to the counties of the state, and may be invoked for the protection, preservation, and collection of the public moneys, whether due to state or county.

We are at the conclusion that, under the pleadings and agreed statement of facts in this case, the state and county of Limestone each had a lien upon all the assets of the said Farmers' & Merchants' Bank for the respective amounts due to each.

The court, by its decree, adjudged that the county was entitled to recover, among other items, the unclaimed witnesses' fees, amounting to $648.71. In this there was error, whether such fees were due to witnesses in state or civil cases. These fees were no part of the public revenues, but were trust funds in the hands of the clerk, and for which he was responsible to the witnesses. The decree must therefore be corrected by striking the item of "unclaimed witnesses' fees—$648.71" from the amount decreed to constitute a lien upon the assets of the bank. By so correcting the decree, the state and county will have liens for the following amounts, viz.: State, $306.63, and the county, $513.59, total due state and county of Limestone, $820.22.

The decree of the circuit court will be so corrected, and, as corrected, will be here affirmed.

We cannot consider the motion to strike the appeal. If there is any merit in the motion, it came too late.

Corrected and affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.