158 So. 801

**O'NEAL et al. v. TURNER, County
Treasurer.**

**4 Div. 787.**

Supreme Court of Alabama.
Jan. 24, 1935.

Rehearing Denied Feb. 21, 1935.

Powell, Albritton & Albritton, of Andalusia, for appellants.

Mulkey & Mulkey, of Geneva, and E. O. Baldwin, of Andalusia, for appellee (cross-appellant).

A. R. Powell, of Andalusia, for cross-appellee.

GARDNER, Justice.

On December 14, 1931, the county commissioners of Covington county, pursuant to the authority of section 322, Code 1923, elected G. M. Turner as treasurer for the county, fixed the amount of his official bond, and concluded the order by directing that "all funds coming into his hands shall be deposited in the Andalusia National Bank."

Turner had in previous years, as county treasurer, been making his deposits in said bank, and continued to do so. He desired, however, an indemnity bond, and prepared one in his office, and delivered it to R. N. McLeod, its president, for its execution with acceptable sureties. His later testimony as to what he did with the bond is not now of controlling importance.

In October, 1932, the bank closed its doors and went into the hands of the liquidating agent of the government; Turner, as county treasurer, having to his credit at the time something in excess of $35,000. The bond which was delivered by McLeod to Turner bore the signature of C. A. O'Neal, R. N. McLeod, T. E. Henderson, Minnie M. Milligan, and C. S. O'Neal, as sureties. The evidence indicates the bond was so delivered about the first of April or the middle of May, Turner finally stating the best he could say was that it was prior to the first of April. On July 7, 1932, C. S. O'Neal left his office and was sick continuously until his death on August 1, 1932. His son Dudley O'Neal is administrator of his estate. Turner, as county treasurer, brought suit against said administrator and the individual sureties above named on the indemnity bond.

Those defendants involved on this appeal interposed the defense of conditional delivery, as evidenced by plea 15, to which plaintiff interposed replication 4, in effect an estoppel. Defendant Henderson interposed also his plea of non est factum. On the issues as thus presented, the case was submitted to the jury, resulting in a verdict for all defendants.

Upon plaintiff's motion for a new trial, the court granted the same, and set aside the verdict as to defendants Dudley O'Neal, as administrator, and T. E. Henderson. The trial judge gave his reasons therefor, and thus specified the ground upon which the motion was granted. As to Henderson he concludes that this defendant did not sustain by his proof his plea 15, "neither did he sustain his plea of non est factum. * * * Therefore, the verdict and judgment should be set aside as to him." As to defendant administrator is the following:

"Now, as to the defendant Dudley L. O'Neal, as administrator of the estate of C. S. O'Neal, deceased, * * * it will be noted that his special plea (plea 15) not only alleges that the instrument was signed under the conditions set forth, but goes further and alleges:

" 'That said bond, or contract, should not be delivered to the plaintiff, until signed by J. D. Henderson, whose name the said Andalusia National Bank, by and through its president, R. N. McLeod, agreed to have affixed to said bond before it was delivered to the plaintiff.'

"This part of the plea clearly was not sustained by the evidence. Neither the testimony of Dudley L. O'Neal, or R. N. McLeod, proves this part of the plea. In fact, to the contrary, the testimony of R. N. McLeod shows that this part of the plea was not proven."

As to the defendant Minnie M. Milligan, the motion was denied, with the following comment: "As to Mrs. Minnie M. Milligan, as stated above, the plaintiff concedes that the testimony sustains her plea, and in this, the court concurs."

Dudley L. O'Neal, as administrator, and T. E. Henderson have appealed from the judgment granting plaintiff's motion for a new trial, and plaintiff prosecutes a cross-appeal from the judgment on the ruling denying his motion as to Mrs. Milligan. We are therefore concerned on this appeal with only these three defendants, considered here in the order of their presentation in brief.

It may be observed at the outset that the court's ruling rested upon no question involving the weight of the evidence, but as to defendants O'Neal and Henderson, the effect of the ruling was that plaintiff was entitled to the affirmative charge against them, thus presenting a question of law or its application to the proven facts.

■ It is the general rule that "a plain error of law in granting or refusing a new trial cannot be aided by any presumption of correct action" (4 Corpus Juris, 782), and this rule is embodied in our statute granting appeals from rulings on motions for a new trial. Section 6088, Code 1923.

■ It is the further rule, in harmony, we think, with sound reasoning, that the court having specified the grounds on which the order is based, will be presumed to have acted on those grounds alone, and to have overruled or disregarded other grounds. 4 Corpus Juris, 785.

■ The review here, therefore, is in accord with the generally recognized rule, as well as our statute, unaided by any presumption as to the correctness of the ruling of the trial court. Plea 15 (substantially the same as to each of these defendants) is to the effect that the bond was signed by defendant as surety upon the express condition that it should

not be delivered until the signature of J. D. Henderson was secured. That this is here a valid defense is well settled, and, indeed, uncontroverted.

The reasoning of the court is that the surety being under no obligation to sign the bond at all, his signature, being his own voluntary act, and under no obligation to deliver a bond which he had signed for the accommodation of the principal obligor, may put such limitations and conditions upon his favor as seem to him proper or to his interest. "The whole matter is at large with him, and, having constituted the principal obligor his agent to deliver the bond, he may impose whatever conditions he chooses upon the act of his agent. * * * The thing to be done not being at all obligatory on him, he can decline to do it absolutely, and he may do it upon whatever conditions, capricious or otherwise, he may elect to impose. * * * If any condition is deemed too onerous, or unreasonable, or impossible, even, of performance, the holder in escrow is not thereby authorized to deliver to the obligee. He has no authority whatever to deliver until the condition, whatever it may be, has been complied with." White Sewing Machine Co. v. Saxon et al., 121 Ala. 399, 25 So. 784, 787. To like effect, also, are the cases of McConnon & Co. v. Kirby, 211 Ala. 440, 100 So. 764, 765; Birmingham News Co. v. Moseley, 225 Ala. 45, 141 So. 689.

■ Nor is it essential that the obligee have notice of the conditional delivery, or that he consented thereto. Whatever may be the rule in other jurisdictions, it is the established law under our decisions that "the obligee is required at his peril to ascertain the scope of the powers of the agent." In McConnon & Co. v. Kirby, supra, speaking to this question, the court said: "It is a law of contracts probably applied daily in business affairs. If there should be a change, it must come by legislation."

The applicable law therefore is clear, and, indeed, uncontroverted. The important question remains whether or not the plea is sustained by the proof.

Considering first the defense of C. S. O'Neal, interposed by the administrator of his estate: The bond was carried by McLeod, the bank president, to C. S. O'Neal for signature, and his son Dudley L. O'Neal was present at the time. O'Neal at first demurred and finally signed after much hesitancy. But before signing, however, he was assured by McLeod that the signature of J. D. Henderson (known also as Dink Henderson) would also be secured as surety. The following excerpt

from the testimony of Dudley L. O'Neal will illustrate: "My father then told him: 'Mr. Dink Henderson hasn't signed this bond yet.' Mr. McLeod told him: 'Well, we are going to get him to sign it.' Finally my father told him: 'I am going to sign the bond, and if Mr. Dink Henderson don't sign this bond, I don't want it delivered, * * * said he wanted it torn up—didn't want it delivered.' He was very stern in what he was telling him. * * * In answer to that, Mr. McLeod told him he was going to ask J. D. Henderson—Dink Henderson—to sign it—was going to leave it over there with Mr. Trammell (who, we interpolate, is T. E. Henderson) to get him to sign it. My father signed the bond and told him that." The testimony of Mr. McLeod is in no manner contradictory of that of Dudley L. O'Neal, but, on the contrary, is corroborative thereof, saying, in part: "Mr. O'Neal signed that bond, and told me that he wanted Mr. Dink Henderson to sign it, and that he must do it. I do remember an expression which Mr. O'Neal used, in which he was very emphatic —he said he must—sure sign it."

It was not of course necessary that O'Neal use the language of the books, and expressly state to McLeod that his signature was "upon condition." Suffice it for all practical purposes if the language in fact used necessarily implied such condition. Clearly what was said could not reasonably be construed otherwise. True, McLeod, in the course of his testimony did say that he told O'Neal that he was not going to get the signature of J. D. Henderson, but a careful reading of all said in that connection discloses the full meaning —to the effect that while he himself did not intend to see J. D. Henderson, and thus himself secure his signature, yet he would turn the bond over to T. E. Henderson for him to secure the signature of J. D. Henderson. He says in part: "I do recall that it was said— that I would not do it, but that it was to be turned over to get Mr. T. E. Henderson to get the signature of J. D. Henderson." Dudley L. O'Neal, testifying upon that point, said: "Mr. McLeod told him that he would give it to Mr. Trammell Henderson and that it was up to him to get Mr. Henderson to sign it and my father said that 'if he did not sign it, he wanted the thing torn up.' In answer to that, Mr. McLeod told him that that was the understanding with all of them—that Mr. Dink Henderson was to sign it."

█ We gather from the argument of counsel it was this feature of the proof that led the trial court to the conclusion the plea was not established. But we interpret this evidence as having but a single meaning—that

while McLeod did not himself intend to personally interview J. D. Henderson, yet he was to be interviewed, and his signature obtained by another, T. E. Henderson, who was to act in his stead. And the last above testimony of Dudley L. O'Neal indicates that after this statement or explanation by McLeod, his father repeated that if J. D. Henderson "did not sign it, he wanted the thing torn up." Whether McLeod in person was to secure the signature of J. D. Henderson, or whether he was to have it secured by another acting for him (T. E. Henderson), was not a matter of material consequence. The all-important point from the standpoint of C. S. O'Neal was the signature of J. D. Henderson; whether secured by McLeod himself, or by another acting in his stead, was wholly immaterial.

We are therefore of the opinion the trial court erroneously concluded O'Neal's plea was not established by the proof.

As to the defendant T. E. Henderson, the court's decision was evidently rested upon his failure of proof to show that he himself discussed the matter of a conditional delivery, or made any statement that the bond was to be destroyed unless J. D. Henderson also signed, or words to like effect. True, Henderson does not pretend to say he made such statements. He knew and understood that J. D. Henderson was also to sign. Indeed, the proof shows such was the understanding of all the sureties. And it is clearly established the bond was in fact left with T. E. Henderson for the purpose of securing the signature of J. D. Henderson. At that time all the other sureties had signed. As the exact time T. E. Henderson signed is a disputed issue of fact, and for the jury's consideration. Henderson finally gave it, as his best recollection, that he signed after all the others had signed, and when the bond was left with him to secure J. D. Henderson's signature, saying: "After Mr. Clant O'Neal signed it, and after Mrs. Milligan signed it, the bond was delivered back to me. I think Mr. McLeod delivered it back to me. It is my best recollection that I signed the bond at that time." McLeod's recollection was that Henderson signed when he and C. A. O'Neal signed. But, in any event, the proof is that the bond was left in Henderson's possession and control to see C. S. O'Neal and obtain the signature of J. D. Henderson. T. E. Henderson did talk with C. S. O'Neal in regard to the matter, but McLeod obtained his signature, as hereinabove disclosed. And after C. S. O'Neal's signature was obtained the bond was again carried to T. E. Henderson to obtain J. D. Henderson's signature. McLeod's testimony is to

the effect that when he then, the last time, left the bond with T. E. Henderson for the above-noted purpose, he fully explained C. S. O'Neal's position in regard to his demand that the signature of J. D. Henderson be obtained, which explanation was pursuant to the promise made said C. S. O'Neal.

■ As previously shown, it is established by the proof, and as we read the testimony undisputedly so established, that C. S. O'Neal did sign the bond on the condition that J. D. Henderson also sign before its delivery to Turner. T. E. Henderson took the bond with full knowledge of the condition imposed by C. S. O'Neal, and put it either in, or on, his desk to await an opportunity to procure J. D. Henderson's signature. J. D. Henderson never signed. But the bond was removed from the desk of T. E. Henderson in his absence from town, and without his knowledge or consent, and delivered by McLeod to Turner, though, to use Henderson's language, "it was to stay there until I could get J. D. Henderson to sign it." It was some time in June he learned it had been removed from his desk. With full knowledge of the conditions imposed by C. S. O'Neal, and having the bond in his possession and control for the purpose of fulfilling such condition, T. E. Henderson knew also there could be no valid delivery of the bond without first securing J. D. Henderson's signature. Such being the situation, we think the correct rule to be that the condition imposed by C. S. O'Neal, that no delivery be made until J. D. Henderson's signature is obtained, inured to the benefit of T. E. Henderson, though he himself did not express such condition.

The following from 50 Corpus Juris, 37, has application: "It has been held that where some of the sureties are released for failure to comply with a condition to procure additional signatures, all others who sign are also released, even though such condition was imposed after the instrument was executed by some of the sureties unconditionally." The text is sustained by the cited case of Norris v. Cetti, 35 Tex. Civ. App. 28, 79 S. W. 641, and finds support by sound reasoning as well.

In the Norris Case, supra, the defense was also conditional delivery, a condition not imposed by the appellant, but in his presence. The court said: "The evidence further shows that appellant was present at the time and heard such instructions, and understood that Burks was to sign the bond, and never knew any better until long after the delivery of the same to appellee. We think, under the facts of this case, that Sims must be regarded as the spokesman for appellant in the matter, and that the condition imposed by him was

such that the instrument constituted an escrow until properly signed by Burks, and that the signing by appellant was upon the same conditions. It was wholly unnecessary for appellant to repeat the language of Sims, for, if the instrument was not to be delivered or used until Burks had signed the same, then, clearly, no liability whatever could attach as to any of the sureties signing it."

So here, according to the proof, McLeod delivered the bond to Henderson, explaining that C. S. O'Neal demanded the signature of J. D. Henderson be obtained or the bond destroyed. Henderson knew there could then be no valid delivery without such signature, and the condition attached to his own signature and inured to his benefit, as it was wholly unnecessary that he expressly state his signature was also on condition. The bond was left in his possession. It was under his control, and when so left was left with the condition attached. The condition of C. S. O'Neal, therefore, for all practical purposes became a condition of his own. So viewed, it is clear there was evidence supporting his plea also, and a holding to the contrary is laid in error.

■■ But defendant Henderson interposed another plea, that of non est factum. The execution of the bond included delivery as well as signatures. Forst v. Leonard, 116 Ala. 83, 22 So. 481; Bender v. Barton, 166 Ala. 337, 52 So. 26; Bibb v. Reid, 3 Ala. 88. And a want of valid delivery of the bond may be shown under a plea of non est factum. 9 Corpus Juris, 116. This defendant's evidence tends to show no valid delivery of the bond, but its removal from his desk, without his authority, knowledge, or consent. True, McLeod says he told this defendant that he was going to deliver the bond to Turner whether J. D. Henderson signed or not, but defendant states he has no recollection of any such conversation. At the most, however, a jury question was presented on this plea, and the jury found in defendant's favor.

■ We have previously observed the ruling of the court was not rested upon any question as to the weight of the evidence. It may, with due propriety, be added, however, that where disputed issues of fact do appear the evidence is such as to leave the conclusion one clearly within the jury's province, and as not presenting a case of a verdict plainly and palpably contrary to the preponderance of the proof. The trial court's conclusion was that the plea of non est factum was also unsupported by the

proof. But we have stated our view to the contrary.

Nor can it be said replication No. 4 to these defendants' pleas (in effect an estoppel, White Sewing Machine Co. v. Saxon, supra) was established by uncontroverted proof. As material to the establishment of this replication, it was not only essential to show that Turner, with knowledge of these defendants, continued to do business as a depositor with the bank on the strength of the delivery of the bond, but that defendants also knew the bond had been delivered in violation of the condition imposed; that is, delivered without the signature of J. D. Henderson. White Sewing Machine Co. v. Saxon, supra.

As to C. S. O'Neal—engaged in other business entirely separate from the bank and of considerable magnitude, and though a director and vice president, yet inactive in its affairs, confined to his bed with his last illness much of the time—we do not find the evidence as to such knowledge on his part sufficient for submission to the jury. Defendant Henderson was a director and vice chairman of the board, but states he had nothing to do with the matter of deposits, that McLeod superintended all clerical work and matters of that character, that the question of this deposit was not discussed in any directors' meeting, and that the only knowledge he had was that Turner was carrying an account at the bank, which, it may be added, he had done previously, and continued to do for some time without any bond.

Henderson's evidence was further to the effect that the bond had been taken from his desk without his knowledge or consent, and he did not see it any more, but learned some time in June the bond had been removed from his desk, though he had no information that it had been delivered to Turner until after the bank was closed. But the testimony of Henderson is to be viewed also in connection with that of McLeod, and the latter's statement to him, if such statement was in fact made, and in connection with all the other proof, including the testimony of Turner. So viewed, we think a jury question was presented as to Henderson's knowledge of a delivery of the bond in violation of the condition. But it was a matter for the jury's determination, the decision of which was embraced in its verdict for defendants, with no occasion here for its disturbance. Moreover, there is evidence from which the jury could reasonably infer that Turner knew of the condition attached when the bond was delivered, and that such condition had not been met. If the jury so found, then his theory of estoppel must fail, for it is established that one who invokes an estoppel must have in good faith been ignorant of the true facts at the time the representation is made to him, and at the time he acted thereon. Patillo v. Tucker, 216 Ala. 572, 113 So. 1.

Nor is there merit in the suggestion that because of the relationship as directors in the bank, these defendants were chargeable with knowledge of the signatures on the bond, and that it had been delivered in violation of the conditions. That argument is sufficiently answered by the holding in Marx & Co. v. Bankers' Credit Life Ins. Co., 224 Ala. 249, 139 So. 421, to the effect that a bank manager is not by reason of his office to be held chargeable with actual knowledge of all the details of the bank's transactions.

The argument is also advanced that the bond here sued upon is embraced within the spirit, if not the exact letter, of section 2617, Code 1923, which guards against an avoidance of liability by sureties on an official bond on account of any conditional delivery thereof. But the bond here in question is not an official bond. Even a bank depositary is not a public office—only a contractee. Compton v. Marengo County Bank, 203 Ala. 129, 82 So. 159. Such bonds are to be executed by the official, and intended as a safeguard against his dereliction in office. This section has no reference to bonds executed to such officials, as was the bond in question, to protect the official against any default of a third person. The bond here in question was executed to the treasurer for his own protection (section 3973, Code 1923; Pickens County v. Williams (Ala. Sup.) 156 So. 548 [1]; Pickens County v. Johnson, 227 Ala. 190, 149 So. 252), creating a mere contractual relationship, and cannot, we think, by any reasonable rule of interpretation be held as embraced in said section 2617 of the Code.

Nor do we consider the words "other trustees" found in the statute as adding any force to plaintiff's contention. With the question as to whether or not the deposit in the bank created any trust relationship as to the funds, and, if so, the effect thereof (Montgomery v. State, 228 Ala. 296, 153 So. 394; Montgomery v. Wadsworth, 226 Ala. 667, 148 So. 419; Montgomery v. Sparks, 225

---

[1] 229 Ala. 250.

Ala. 343, 142 So. 769), we are not here concerned, and express no opinion. Suffice it to say the bank was not a "trustee" within the meaning of the word as used in this statute. These words "other trustees" must properly be construed in connection with all the language of the statute making special reference to executors, administrators, and the like, and take color therefrom under the ancient maxim noscitur ex sociis—the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. Life & Casualty Ins. Co. v. Bottoms, 225 Ala. 382, 143 So. 574; Louis Pizitz Dry Goods Co. v. Fidelity & Deposit Co., 223 Ala. 385, 136 So. 800. In Murfree on Official Bonds, § 312, the author points out that such bonds as noted in this statute, aside from public officers as such, are those required of persons who, not being officers in a proper sense of the term, are nevertheless acting continuously under the supervision of the courts. See, also, same authority, section 36. Such a statute clearly has no reference to any mere resulting trust relationship, or to a mere trustee in invitum. This statute, therefore, is without application here, viewed in any aspect.

■ Plaintiff further insists that the bond was executed in order to secure the deposit for the bank, and that these defendants, stockholders and directors, were to be held to liability upon the theory of having received the benefit of the transaction, and that they cannot now be heard to repudiate the same. Turner had previously been making his deposits at this bank, and continued to do so after his selection in December, 1931. Indeed, such was the direction contained in the order of his appointment, that he make his deposits in this bank. But Turner desired bond for his own protection, and the most that can be said from the evidence in this regard is that he (Turner) threatened to withdraw the same unless bond was given. But these defendants were not acting in any official capacity. They were binding themselves, evidently at the importunity of McLeod who was fearful of the withdrawal of the account. But they were acting as individuals, and in no official or representative capacity, and had the right to impose the condition of J. D. Henderson's signature also. They rested under no duty in the premises, but it was a voluntary act on their part, and any benefit accruing to the bank was as to them collateral, and only incidental.

We are persuaded, therefore, that the legal principle cited by counsel for plaintiff, as found stated in 21 R. C. L. p. 932, to the effect that one who receives the benefit of a transaction must also accept the responsibilities, is here inapplicable. 2 Corpus Juris, § 115, p. 495.

[■ Nor do we see any difficulty in the way as to the regularity of the judgment on motion for new trial, granting the same as to some of the defendants and overruling it as to others. Young v. Woodward Iron Co., 216 Ala. 330, 113 So. 223.

While the defense was in large part common to all, yet the evidence as to each differed, and clearly there is no necessity in such a case that the judgment as to one should control that of the others. Jackson v. Georgia Fire Ins. Co., 189 Ala. 495, 66 So. 588, Ann. Cas. 1917A, 807; section 5720, Code 1923. We are therefore persuaded that the issues presented in defendants' pleas and plaintiff's replication thereto were proper for the jury's determination, and considering the case from all other angles than those specified by the trial judge, we see no cause that the verdict of the jury in their behalf should be here disturbed.

On cross-appeal by plaintiff complaining of the ruling denying the motion as to Mrs. Milligan, little need be said. The evidence clearly, if indeed not undisputedly, establishes her plea of conditional delivery, which fact seems to have been conceded by counsel in the court below.

It is evident that the other questions argued by plaintiff as to liability of the other defendants, for reasons hereinabove discussed, prompted the cross-appeal as to Mrs. Milligan. These we have already considered, and they need no further discussion. Suffice it to say, therefore, that the judgment denying the motion for a new trial as to her was proper, and will be here affirmed.

It results, therefore, that the judgment granting the motion as to defendants Dudley L. O'Neal, as administrator, and T. E. Henderson will be reversed, and a judgment here entered denying the motion, and reinstating the original judgment. And that on plaintiff's cross-appeal, the judgment as to defendant Mrs. Milligan will be affirmed.

Reversed and rendered on direct appeal. Affirmed on cross-appeal.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.