M. O. SIMS, Fred A. Beam, Wylie Johnson, G. R. Southard, Miles S. Lee, Paul Friedman, William Lindsay Williams, William P. Shaw, Jr., Prentice W. Thomas, Richard D. Tannehill, Paul M. Byrne, David R. Baker, Charles Morgan, Jr., and George Peach Taylor, for themselves jointly and severally, and for all others similarly situated, Plaintiffs,

R. E. Farr, Marshall Meadows, Jack Hopping, Jack Ryan, Max W. Morgan, David J. Vann, Robert S. Vance, Richard P. Humphrey, Jr., John W. McConnell, Jr., Joseph N. Langan, William M. Williams, Jr., and Garet Van Antwerp, Intervening Plaintiffs,

v.

Bettye FRINK, Secretary of State of the State of Alabama; Harrell Hammonds, Judge of Probate of Lowndes County, Alabama; John A. Sankey, Judge of Probate of Montgomery County, Alabama; J. Paul Meeks, Judge of Probate of Jefferson County, Alabama; John Grenier, Chairman of the Alabama State Republican Executive Committee; Perry O. Hooper, Secretary of the Alabama State Republican Executive Committee; Roy Mayhall, Chairman of the Alabama State Democratic Executive Committee; H. G. Rains, Secretary of the Alabama State Democratic Executive Committee; MacDonald Gallion, Attorney General of the State of Alabama, Defendants.

Civ. A. No. 1744-N.

United States District Court
M. D. Alabama, N. D.

July 21, 1962.

**432**

Charles Morgan, Jr., George Peach Taylor, Robert H. Loeb, and Kenneth Howell, Birmingham, Ala., for plaintiffs.

Cooper, Mitch & Crawford, Birmingham, Ala., for intervening plaintiffs R. E. Farr, Marshall Meadows, Jack Hopping, Jack Ryan and Max W. Morgan.

David J. Vann, Robert S. Vance and C. H. Erskine Smith, Birmingham, Ala., for intervening plaintiffs David J. Vann, Robert S. Vance, and Richard P. Humphrey, Jr.

John W. McConnell, Jr., Mobile, Ala., for intervening plaintiffs John W. McConnell, Jr., Joseph N. Langan, William M. Williams, Jr., and Garet Van Antwerp.

Boswell & Smith, Geneva, Ala., for defendant Harrell Hammonds.

Roy D. McCord and H. G. Rains, Gadsden, Ala., for H. G. Rains.

MacDonald Gallion, Atty. Gen. of Alabama, Leslie Hall and Gordon Madison, Asst. Attys. Gen., of Alabama, Montgomery, Ala., for MacDonald Gallion and Bettye Frink.

Before RIVES, Circuit Judge, and THOMAS and JOHNSON, District Judges.

## PER CURIAM.

Plaintiffs and the plaintiff-intervenors, as citizens of the United States and of the State of Alabama, and as taxpayers and duly qualified and registered voters in said State and in the Counties of Jefferson and Mobile, jointly and severally bring this action in their own behalf and in behalf of all other voters in the State of Alabama who are similarly situated. The defendant Bettye Frink is sued in her capacity as Secretary of State for the State of Alabama and as a State constitutional official, who is charged with certain duties and responsibilities concerning the election of members of the Alabama Legislature. The defendants Hammonds, Sankey and Meeks are the duly elected, qualified and acting probate judges of Lowndes, Montgomery and Jefferson Counties, respectively. They are sued in their official capacity as constitutional officers for the State of Alabama and as representatives of all the probate judges of Alabama, who are charged by law with performing and exercising certain duties and powers in connection with the nomination and election of members of the Alabama Legislature. The defendants Grenier and Mayhall are the duly elected, qualified and acting Chairmen of the Alabama State Republican Executive Committee and of the Alabama State Democratic Executive Committee, respectively. They are made defendants in their official capacity as Chairmen of the Executive Committees of said political parties, who are charged by law in the State of Alabama with performing certain duties and functions in connection with the selection, nomination and election of members of the Alabama Legislature. The defendants Hooper and Rains are the duly elected, qualified and acting Secretaries of the Alabama State Republican Executive Committee and the Alabama State Democratic Executive Committee, respectively. Each is sued in his official capacity as an officer of the political party as indicated and is charged by the law of Alabama with performing certain functions and duties in connection with the selec-

tion, nomination and election of the Alabama legislators. The defendant MacDonald Gallion is the duly elected, qualified and acting Attorney General of the State of Alabama, who is charged by the law of the State of Alabama with performing certain duties and functions in connection with the nomination ad election of members of the Alabama Legislature.

The plaintiffs[1] bring this action in their own behalf and in behalf of all registered and qualified voters similarly situated, for a declaration of their rights concerning the apportionment of representatives and senators among the counties of the State of Alabama and for such relief as may be proper to assure them, and all other voters of the State of Alabama that are similarly situated, free and equal suffrage and equal protection of the laws which plaintiffs claim have been for many years denied them by the defendants and their predecessors in office. The plaintiffs say that this Court has jurisdiction of this cause and that they have a right to institute this cause under 17 Stat. at Large 13 and 16 Stat. at Large 144; 42 U.S.C. §§ 1983 and 1988, as follows:

"§ 1983. *Civil action for deprivation of rights.* Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

\* \* \* \* \* \*

"§ 1988. *Proceedings in vindication of civil rights.* The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, \* \* \*."

The plaintiffs, as citizens of the United States and of the State of Alabama, base their claim that they are denied the equal protection of the law accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes, since the Legislature of the State of Alabama has failed and continues to fail to reapportion itself since 1900. Plaintiffs say that the failure of the Alabama Legislature to reapportion itself violates §§ 198, 199 and 200 of the Alabama Constitution of 1901.[2]

In our order of March 30, 1962, setting for hearing the application for interlocutory injunction we indicated our tentative but unanimous opinion that no injunction was required prior to the primary elections, then set for May, 1962, in order for citizens of the State represented by the plaintiffs in this case to be accorded any constitutional rights asserted in time for the exercise of such rights at the general election in November, 1962. In that order we expressed the further view that there was time for the Legislature of Alabama to comply with its duty prescribed by the Constitution of 1901 of the State of Alabama, and that no action on the part of this Court which was not absolutely essential for the protection of any constitutional rights asserted in the complaint should be taken before the Legislature of Alabama had had a further reasonable but prompt opportunity to comply with its duty. The application for interlocutory injunction was assigned for hearing for April 14, 1962. 205 F.Supp. 245.

On that date we reiterated the same views in continuing the application for interlocutory injunction and resetting it

1. The term "plaintiffs" will be used throughout this opinion to include the original plaintiffs and all intervening plaintiffs.

2. See Appendix "A."

for hearing on July 16, 1962. In that order, for the guidance of counsel and for such aid as we might be, we made certain additional remarks to which we now adhere, as follows:

"We remain of the same opinion that was expressed in the order setting the application for hearing, viz.: until the Legislature has had a further reasonable but prompt opportunity to comply with its duty under Sections 199 and 200 of the Constitution of Alabama, this Court should take no action not absolutely essential for the protection of the constitutional rights asserted in the complaint; and no ruling before the primary elections of May 1962 appears essential.

"The application for interlocutory injunction pertains to the conduct of both the primary elections of May. 1962 and the general election of November 1962. That application is therefore continued and re-set for hearing at 10 o'clock a. m. on Monday, July 16, 1962. The hearing cannot be set for a much later date because, if this Court is to act effectively, some action must be taken in ample time before the general election of November 1962.

"For the guidance of counsel and for such aid as we may be in solving the troublesome but important subject of this litigation, we make the following additional remarks:

"(1) Under the opinion of the Supreme Court of the United States in Baker v. Carr, 82 S.Ct. 691, [No. 6, October Term, 1961] decided March 26, 1962, it seems clear to us that: (a) this Court has jurisdiction of the present action; (b) the complaint as amended states a justiciable cause of action; (c) the plaintiffs have standing to challenge the Alabama apportionment statutes.

"(2) We have no disposition to discourage the introduction of evidence by any party, and in the ordinary case our opinion as to whether the plaintiffs will be entitled to appropriate relief should await the introduction of evidence. However, we take judicial notice of the same facts which are well known to the Justices of the Supreme Court of Alabama and to the people of this State, as expressed on two different occasions in opinions of the Justices.

" 'We judicially know that the population of the various counties of this state has changed during the years which have intervened since the Constitution of 1901 was adopted, so that the representation as provided in §§ 1 and 2 of Title 32, Code 1940, cannot be said to be on a population basis.'

Opinion of the Justices of the Supreme Court of Alabama, No. 117, August 14, 1950, 254 Ala. 185, 47 So.2d 714, 717.

" 'We know, and the people of this State know, that our Constitution says that it *shall* be the duty of the legislature to reapportion the legislature according to population after each decennial census and that this constitutional mandate of the Constitution of 1901 has never been complied with.'

Opinion of the Justices of the Supreme Court of Alabama, No. 148, July 11, 1955, [263 Ala. 158] 81 So. 2d 881, 887.

"(3) The controlling constitutional formula which runs throughout the Constitution of Alabama is thus expressed in the last sentence of Section 284 of said Constitution: 'Representation in the legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments.' See also Sections 198 to 201, inclusive. If that formula is met, then there can be no valid objection under the equal protection clause or any other part of the Constitution of the United States, which is, of course, the supreme law of the Land, binding alike on this Court and on the Legislature of Alabama

(Article VI, Clauses 2 and 3 of the Constitution of the United States). It is necessary that any action taken by the Legislature comply with constitutional standards, and it is important that such standards be met not halfheartedly but fully, because once there has been a legislative reapportionment, unless it so completely fails to meet constitutional standards that it must be set aside by court order, it will not be subject to alteration until the next session of the Legislature after the decennial census in 1970 (Constitution of Alabama, Section 198).

"(4) In the event that the Legislature of Alabama complies with its duty before the next hearing, and this Court can so find, then no further action will be needed in this case and the case can be dismissed. If the Legislature does not act, or if its action does not meet constitutional standards, then we will be under a clear duty to take some action in time to take effect before the general election of November 1962. Such action, however, should be held to the minimum that is necessary for the citizens of Alabama to be accorded their constitutional rights.

"(5) To that end, it is fair to advise the parties of our present thinking that we would then follow the plan suggested in the concurring opinion of Mr. Justice Clark in Baker v. Carr, supra:

" 'One plan might be to start with the existing assembly districts, consolidate some of them, and award the seats thus released to those counties suffering the most egregious discrimination. Other possibilities are present and might be more effective. But the plan here suggested would at least release the strangle hold now on the Assembly and permit it to redistrict itself.'

"(6) While retaining jurisdiction, we could then defer further decision or action to afford the newly elected Legislature full opportunity to heed the constitutional mandate to reapportion. When that has been done the duty resting on us will be at an end and the case can be dismissed."

On July 12, 1962, an Extraordinary Session of the Legislature of Alabama passed a proposed constitutional amendment, commonly referred to as the "67-Senator Amendment," [3] this proposed constitutional amendment being subject to the ratification of the voters of the State of Alabama in an election to be held in November, 1962. On the same date, the Governor of the State of Alabama signed into law the "Crawford-Webb Bill," [4] as passed by the Alabama Legislature, which has been referred to as a "standby" legislative act to take effect in the event the voters of the State of Alabama refuse to ratify the proposed "67-Senator Amendment," or this Court refuses to accept said "67-Senator Amendment" as effective action that complies with federal constitutional requirements as laid down in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663. The final submission on the motion for interlocutory injunction was on July 16, 1962. This submission was upon the pleadings—a part of which were verified, the affidavits and exhibits thereto, the oral testimony and certain exhibits thereto, and the briefs and arguments of the parties.

It has been generally conceded throughout this litigation by all the parties that the present apportionment of both Houses of the Legislature of the State of Alabama constitutes "invidious discrimination" in violation of the Equal Protection Clause of the Fourteenth Amendment. The invidiousness of the situation is demonstrated by Appendix "D" to this opinion, this appendix listing each of the 67 counties in the State of Alabama, the population of each county in 1901 when the Legislature was last reapportioned, the present population of

---

3. Officially known as Senate Bill 29 and attached hereto as Appendix "B."

4. Officially known as House Bill 59 and attached hereto as Appendix "C."

each county, and the representatives authorized from each county to the Alabama House of Representatives; and by Appendix "E" listing the 35 senatorial districts, the population of each district in 1900 and the population of each district in 1960—each senatorial district in Alabama being authorized one representative to the Senate.

Upon this submission, it becomes our duty: (1) to determine whether those Acts comply with constitutional standards and (2) in the event we are forced, however reluctantly, to find that they do not comply with the guaranty of the equal protection of the laws, then to decide what remedies are available to and should be utilized by this Court.

In proceeding to the performance of that duty we would make a few preliminary comments. It is not our function or desire to criticize the present or preceding legislatures for any failure to heed the clear mandate both of the Constitution of the United States and of the Constitution of Alabama. Nor would we criticize the Alabama courts for refusing to afford relief prior to Scholle v. Hare, 1962, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed. 2d 1 (see Waid v. Pool, 255 Ala. 441, 51 So.2d 869), or even since that decision (see Ex parte Rice, Ala.1962, 143 So.2d 848). However, in the light of the constitutional principles announced in Baker v. Carr, supra, such failures on the parts of the legislative and judicial departments of the State have left the plaintiffs no alternative but to ask the federal courts to protect the constitutional rights of the citizens of Alabama.

Each of the cases which has arisen since Baker v. Carr, supra, has agreed that the test of compliance with the guaranty of the equal protection of the laws is whether the inequality in voting power is a result of "invidious discrimination." Sanders v. Gray, D.C., 203 F. Supp. 158 (April, 1962); Toombs v. Fortson, N.D.Ga., 1962, 205 F.Supp. 248; Moss v. Burkart, W.D.Okl., 1962, 207 F.Supp. 885. In Sanders v. Gray, supra, Judge Bell considered the test rather fully, and arrived at the conclusion that the Supreme Court has now adopted the test urged by Mr. Justice Douglas in his dissenting opinion in South v. Peters, 1950, 339 U.S. 276, 281, 70 S.Ct. 641, 94 L.Ed. 834, that there shall be no inequality in voting power by reason of invidious discrimination.[5]

Judge Bell continued to formulate a test for invidiousness on a consideration of all relevant factors such as rationality or irrationality of state policy, whether or not the system is arbitrary, whether or not the system has a historical basis in our political institutions—federal or state, the presence or absence of political

5. In the course of that opinion the Justice had commented that, "The creation by law of favored groups of citizens and the grant to them of preferred political rights is the worst of all discriminations under a democratic system of government." 339 U.S. at 279, 70 S.Ct. at 643. In like vein, Professor James E. Larson of the Bureau of Public Administration of the University of Alabama begins his recent work on "Reapportionment and the Courts" with such statements as:

"Any citizen, if asked, would in all probability admit to a sense of outrage at the suggestion that his vote be counted for less in the election of legislative representatives than the vote of any other citizen. The principle that a vote cast be counted of equal value to any other is so fundamental to our understanding of democracy as to pass unchallenged. Yet, in practice, the system of legislative representation in one American state after another shows a tenacious disregard for this rudimentary requirement of political equality."

and

"In a democracy, any action or condition which affects the right to vote is an important matter. It is puzzling, therefore, that unequal representation in the state legislature is not a subject to grip the interest and stir the emotions of the public. Aggrieved citizens no longer rise in force to march on state capitals with the complaint that lack of adequate representation is a cause of sufferings which are 'tedious and beyond the patience of a Job to endure.' Drift of taxing power to Washington, apathy, sophistication, and some cynicism about state government have made such displays out of place and in bad taste. Yet state legislatures today stand as a monumental denial of the principles to which we are committed."

remedy, and the delicate relationship between the federal and state governments under the Constitution.

This Court has reached the conclusion that neither the "67-Senator Amendment," nor the "Crawford-Webb Act" meets the necessary constitutional requirements. We find that each of the legislative acts, when considered as a whole, is so obviously discriminatory, arbitrary and irrational that it becomes unnecessary to pursue a detailed development of each of the relevant factors of the test.

While it is true that this Court is not here primarily concerned with the constitutionality of any of the proposed action of the Legislature as measured by Alabama constitutional standards and requirements, this Court is here concerned with whether or not the Alabama Legislature, in taking the action defendants now propose to this Court as "effective legislation," has complied with the constitutional standards required by the Constitution of the United States. In addition, this Court recognizes that there are State constitutional standards to be applied and failure to apply those State constitutional standards by this Court, after it has already taken jurisdiction in this case, will amount to a failure to recognize the principles laid down by the Supreme Court of the United States in Louisville & Nashville Railroad Co. v. Garrett, 231 U.S. 298, 34 S.Ct. 48, 58 L.Ed. 229, and followed in Wofford Oil Co. v. Smith, D.C., 263 F. 396.

The pertinent portion of § 284 of the Constitution of Alabama is as follows:

"  *   *   * Representation in the legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments."

This provision in § 284 has never been considered by the courts of the State of Alabama in an adversary proceeding. This Court is informed that during the interval provided by this Court in its order of April 14, 1962, the Legislature refused to inquire of the Supreme Court of the State of Alabama whether this provision in the Constitution of the State of Alabama could be changed by constitutional amendment as the "67-Senator Amendment" proposes. This section of the Constitution of the State of Alabama has been treated, however, by several Justices of the Supreme Court of Alabama in nonadversary proceedings as follows:

(1) In re Opinion of Justices, No. 116, 254 Ala. 183, 47 So.2d 713 (1950), where three of the present members of the Alabama Supreme Court, plus one member now deceased,[6] stated:

"The official proceedings of the Constitutional Convention of 1901 (see Vol. 3, Official Proceedings, Constitutional Convention of 1901, pages 3906–3924) clearly disclose the purpose of the convention to withhold from the legislature the authority to propose amendments to the organic law which would effectively *change the basis of representation in the legislature.* Unquestionably, the above quoted provision of section 284, supra, withholds from the legislature the power and authority to initiate amendments to the Constitution which would have the effect of changing the basis of representation in the legislature to other than a population basis."

(2) Opinion of the Justices, No. 148, 263 Ala. 158, 81 So.2d 881 (1955), where four of the Alabama Supreme Court Justices, only two of whom are now on the Court,[7] stated:

"Surely it is self evident that with the ultimate sovereignty residing in the people, they can legally and lawfully remove any provision from the Constitution which they previously put in or ratified, even to the extent of amending or repealing one of the sections comprising our Declaration of Rights, even

---

6. Justices Brown, Livingston, Lawson and Simpson.

7. Justices Simpson, Stakely, Merrill and Mayfield.

though it is provided that they 'shall forever remain inviolate.'"

In the same opinion three of the Alabama Supreme Court Justices, all of whom are presently members of that Court,[8] stated:

"The only way that the people can amend or change the last sentence of Section 284, supra, is through a constitutional convention. It cannot be done by constitutional amendment."

The manifest uncertainty of the legality of the proposed constitutional amendment, as measured by State standards and as demonstrated by the above-quoted opinions of the Justices of the Supreme Court of Alabama, forces this Court to the conclusion that the Legislature may not have complied with the State Constitution in the passage of such an Act.

That portion of the proposed constitutional amendment providing a senator for each of the 67 counties of the State if approved by the voters would serve to make the discrimination in the Senate even more invidious than at present. Under the proposed amendment, senators elected by 20% of the State population could effectively block any proposed legislation, and senators elected by 14% of the population could prevent the submission of any future proposal to amend the Constitution of the State of Alabama. The present control of the Senate by members representing 25.1% of the people of Alabama would be reduced to control by members representing 19.4% of the people of the State. The 34 smallest counties, whose total population is less than that of Jefferson County, would have a majority of the total membership of the Senate. The only conceivable rationalization of this provision is that it is based on political units of the State and is analogous to the requirement of the Constitution of the United States that the Senate "shall be composed of two senators from each state." Article I, Section 3, Clause 1, superseded by Amendment 17. The analogy cannot survive the most superficial examination into the history of the requirement of the Federal Constitution and the diametrically opposing history of the requirement of the Alabama Constitution that representation shall be based on population. Nor can it survive a comparison of the different political natures of states and counties. It has been held repeatedly in Alabama that a county derives its power from the State; that a county is but a governmental agency, possessing no power and subject to no duty not originating from the law by which it is created and in which its functions are defined. The Alabama courts have said that a county is nothing more than an involuntary political or civil division of the State, created by statute to aid in the administration of government; that whatever power the county possesses, or whatever duty it is required to perform, originates solely in the statutes creating it, or in the statutes declaring its power and duty. Askew v. Hale County, 54 Ala. 639; State v. Butler, 225 Ala. 191, 142 So. 531; Tuscaloosa County v. Alabama Great Southern R. R. Co., 227 Ala. 428, 150 So. 328; Montgomery v. State, 228 Ala. 296, 153 So. 394; Moore v. Walker County, 236 Ala. 688, 185 So. 175.

In a previous order we indicated our view that the controlling or dominant provision of the Alabama Constitution on the subject of representation in the Legislature was the last sentence of § 284 heretofore quoted. To some extent that thought is emphasized separately as to the House by §§ 198 and 199 and as to the Senate by § 200, but at the same time diluted by other and somewhat conflicting requirements. As to the House, it is provided that each county shall be entitled to one representative and that the total shall be not more than 105 plus the number of new counties subsequently created, so that the total membership of the House is now 106, of which 67 are distributed one to each of the 67 counties, leaving only 39 to be apportioned among the several counties ac-

---

8. Justices Livingston, Lawson and Goodwyn.

cording to the number of inhabitants in each. As to the Senate, it is provided by § 197 that, "The whole number of senators shall be not less than one-fourth or more than one-third of the whole number of representatives." At present the number of senators is the maximum, 35. Section 200 provides for "as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more." It further provides that, "No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other."

■ If what we have called the controlling or dominant provision that representation shall be based upon population should be met completely in both Houses, then, without doubt, the State would accord to every person the equal protection of the laws in compliance with the Fourteenth Amendment. It is difficult to determine how far that overriding requirement of the Federal Constitution can be met and also comply with each of the more detailed requirements of the Alabama Constitution. Certainly an earnest effort must be made to meet all such requirements, and it is only in the event that proves impossible that the Supremacy Clause of the Federal Constitution would cause any irreconcilable and conflicting requirement of the State Constitution to give way. Such a result must appear necessary beyond a reasonable doubt before any of the requirements of the State Constitution can be ignored. The result is that we must approach the task of finding a remedy for the existing invidious discrimination within the framework of each of the detailed requirements of the Alabama Constitution.

Those requirements make it obvious that in *neither* the House nor the Senate can representation be based strictly and entirely upon population. There must be differences in the values of votes from the several counties in each House

of the Legislature. In Toombs v. Fortson, supra, that court concluded that it must apply the "invidious discrimination" test "in determining whether the plaintiffs' rights under the equal protection clause have been violated by a system of legislative representation in either or both of the chambers of the State Legislature in such manner or to such a degree as to constitute invidious discrimination as to them."

■ In that case the court further stated that " * * * we do not find any authoritative decision by the Supreme Court that causes us to require that in order to give the plaintiff his constitutional rights the state legislature must be constituted of two Houses, both of which are elected according to population." It conceded, however, that there was some basis for that argument in the light of Scholle v. Hare, supra, especially when consideration is given to Mr. Justice Douglas's dissenting opinion in MacDougall v. Green, 335 U.S. 281, at pages 287, 289, 69 S.Ct. 1, 93 L.Ed. 3. See also The Maryland Committee for Fair Representation, et al. v. Tawes, Governor, No. 13920 Equity, from the Circuit Court for Anne Arundel County, Md., filed June 28, 1962. In the present case that doubtful question is further complicated by the detailed requirements of the Alabama Constitution which, as has been said, make it impossible for the representation in *either* House to be based strictly and entirely upon population. The result may well be that representation according to population *to some extent* must be required in *both* Houses if invidious discrimination in the legislative systems as a whole is to be avoided. Indeed, as has also been observed, it is the policy and theme of the Alabama Constitution to require representation according to population in both Houses as nearly as may be, while still complying with more detailed provisions. So long as only extremely partial representation according to population can be achieved in the House, we do not believe that the principle of representation according to population can be complete-

ly abandoned in the Senate, as would be done under the "67-Senator Amendment." The provision that the Senate shall consist of a senator from each of the 67 counties, in our opinion, in the light of the other provisions of the Alabama Constitution governing representation in the Legislature, would result in invidious discrimination and a denial of the equal protection of the laws. Compare Brewer v. Gray, Fla.1956, 86 So.2d 799. These reasons are in addition to those heretofore given in this opinion.

The proposed reapportionment of the Senate in the "Crawford-Webb Act" is a step in the right direction, but an extremely short step. It does correct a few of the most glaring discriminations by eliminating such single county senatorial districts as Lowndes with a population of 15,417, Wilcox with a population of 18,739, Barbour with a population of 24,700, and Marengo with a population of 27,098, and puts those small counties into multiple county districts. It makes Etowah, with a population of 96,980, into a single county district. The Act embodies some other improvements on the present system of representation in the Senate. On the other hand, this piece of legislation keeps the control of the Alabama Senate in 27.6% of the people of the State of Alabama. This represents an improvement of only 2.6% over the present control of 25.1%. The vote of a citizen of the Bibb and Perry senatorial districts would be worth twenty times that of a citizen in the Jefferson senatorial district. The vote of a citizen in the 6 smallest senatorial districts would be worth fifteen or more times that of a citizen in the Jefferson senatorial district. In 22 districts, a citizen would have eight or more times as much representation as a citizen residing in the Jefferson district. Other isolated variations are: Lauderdale (population 61,622) is given one-half a senator by being placed with Limestone (population 36,513), making a district

of over 98,000 people. This is opposed to Pickens (population 21,882) and Lamar (population 14,271), having one-half a senator each, with a total population of 36,153. To aggravate this, Colbert (population 46,506), Franklin (population 21,988) and Marion (population 21,837), having a total population of over 90,000, are given one-third a senator, while Henry (population 15,236), Hale (population 19,537), Bibb (population 14,357), Perry (population 17,358), Bullock (population 13,462), Lowndes (population 15,417), Marengo (population 27,098) and Sumter (population 20,041), all in the Black Belt area, are each placed in two-county senatorial districts and thereby given one-half a senator. An analysis of the "Crawford-Webb Act" as it proposes to reapportion the Alabama Senate is attached hereto as Appendix "F." In summary as to the Senate, at best the "Crawford-Webb Act" represents a slight improvement over the present system of representation.

The "Crawford-Webb Act" as it concerns the Alabama House of Representatives is totally unacceptable. The proposed allocation of seats in the House adopts the Alabama constitutional requirement of one per county, with the remaining 39 seats allocated in a manner showing that no rational reapportionment plan was followed.[9] For instance, each representative from Jefferson County (12 total) and Mobile (6 total) must represent over 52,000 citizens. The Black Belt counties of Bullock, Lowndes, Autauga, Perry, Hale, Greene, Wilcox and Henry, all have representatives speaking for less than 20,000 citizens.

The Legislature itself must have recognized that the provisions of the "Crawford-Webb Act" for representation in the House were not fair or reasonable when it proposed in the "67-Senator Amendment" a reapportionment of the House of Representatives, based upon reason, with a rational regard for known and accepted standards of apportion-

9. See "A Survey of Methods of Reapportionment in Congress," by Edward V. Huntington, Department of Mathematics, Harvard University, Senate Document No. 304, 76th Congress, Third Session.

ment. The "67-Senator Amendment" proposes to apportion the seats in the House of Representatives according to the "Equal Proportions Method." (See footnote 9, supra.) It is an endeavor to equalize the representation between counties in the House of Representatives of a fixed size by reducing as much as possible the percentage difference between the representation of each county. This Court accepts and adopts as a part of its order that portion of the proposed "67-Senator Amendment" that relates to the reapportionment of the Alabama House of Representatives. This action will increase the representation of 6 counties as follows: Jefferson from 7 to 17; Mobile from 3 to 8; Calhoun from 2 to 3; Etowah from 2 to 3; Madison from 2 to 3; and Tuscaloosa from 2 to 3. It will decrease the representation of 19 counties as follows: Dallas from 3 to 2; the following each from 2 to 1: Jackson, Chambers, Tallapoosa, Hale, Perry, Sumter, Marengo, Wilcox, Lowndes, Elmore, Butler, Pike, Lee, Russell, Barbour, Henry, Clarke and Bullock. It will result in apportioning the House seats (106) as follows: Jefferson—17 (population 634,864); Mobile—8 (population 314,301); Montgomery—4 (population 169,210); Calhoun—3 (population 95,878); Etowah—3 (population 96,980); Madison—3 (population 117,348); Tuscaloosa—3 (population 109,047); Dallas, Lauderdale, Morgan, Talladega and Walker—2 each; the remaining counties—1 each.

As a permanent piece of legislation the "Crawford-Webb Act" would remain in effect not subject to alteration until the next decennial federal census. See §§ 198 and 200 of the Constitution of Alabama of 1901. The Attorney General of Alabama so argues in his brief, as follows: " * * * if the constitutional amendment is defeated, the statutory bill, if constitutionally sound, will be effective and cannot be changed before the next Federal Census." Because any legislative reapportionment is not subject to change over such a long period, we called attention in our order of April 14, 1962

to the importance of constitutional standards being met "not halfheartedly but fully." As a piece of permanent legislation the provisions of the "Crawford-Webb Act" both as to the Senate and as to the House are totally unacceptable.

Those provisions are unacceptable for the further reason that the effective date of the Act is postponed until the general election to be held in November 1966, so as to await the approval or disapproval by the voters of the "67-Senator Amendment." Such postponement was unnecessary because, as we have already held, the portion of that proposed amendment providing a senator for each of the 67 counties, if approved by the voters, would itself be unconstitutional. No good reason is shown, therefore, why the plaintiffs and others like situated should be thus postponed in the exercise of their rights to the equal protection of the laws, nor why this Court should not now take some steps which may enable the Legislature elected in November 1962 to provide for a fair and proper reapportionment.

The changes resulting from the present order of this Court, unlike those which would result from a permanent Act of the Legislature, will be subject to change by the newly elected Legislature. As indicated in our order of April 14, such changes should be held to the minimum necessary to release the strangle hold on the Legislature and permit it to reapportion itself.

The duty to reapportion rests on the Legislature. This Court acts in the matter reluctantly because of the long-continued default and total inability of the Legislature to reapportion itself. Even under such circumstances, we think that a federal court, in the light of its delicate relationship with a state legislature, should, so far as is possible, accept such parts of the Acts of the Legislature as have any merit in framing the order of the Court. For the purpose of the order of the Court to release the strangle hold on the Legislature and permit it to reapportion itself, such parts of the Acts of the Legislature need not

meet the standard of constitutionality required of a permanent Act of reapportionment.

██ We have no hesitancy in accepting as a part of this Court's order the provisions of the proposed "67-Senator Amendment" relating to the House of Representatives. The real difficulty comes as to the Senate. The proposed reapportionment of the Senate in the "Crawford-Webb Act," unacceptable as a piece of permanent legislation, may not even break the strangle hold. The only alternatives, however, which have been suggested or which appear to be subject to approval by the application of mathematical or judicial as distinguished from political standards, would result in very drastic reapportionment, and would probably place 9 counties having over half the population of the State in control of the Senate. Several senators would have to be allotted to Jefferson County and more than one to Mobile County and to Montgomery County. If the provisions of the State Constitution do not permit a single county to be divided into more than one senatorial district, such restriction would have to be held in conflict with the overriding requirement of equal protection of the laws provided by the Federal Constitution. We are not yet convinced of such conflict beyond a reasonable doubt. Despite our doubts as to their sufficiency, we therefore accept,

in framing our order, that part of the "Crawford-Webb Act" providing for the reapportionment of the Senate.

It is this Court's intention that the changes relating to the House of Representatives provided in the proposed "67-Senator Amendment" and those relating to the Senate provided in the "Crawford-Webb Act" should go into effect at the general election to be held in the State in November 1962, and with the Legislature as provisionally reapportioned by this Court taking office immediately after said election. It is this Court's further intention to retain jurisdiction of this case and defer any hearing on plaintiffs' motion for a final injunction until the Legislature, as provisionally reapportioned by this order, has an opportunity to provide for a true reapportionment of both Houses of the Alabama Legislature. The Court hopes that the moderate steps taken by this order may be enough to break the strangle hold. They certainly will not suffice as any permanent reapportionment. If they should prove insufficient to break the strangle hold, the Court remains under the solemn duty to relieve the plaintiffs and other citizens like situated from further denial of the equal protection of the laws. That much must be accomplished before there can be a final disposition of this case.

In order to effectuate this opinion the Court will issue an appropriate order.

APPENDIX "A"

"Sec. 198. The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken."

\* \* \*

"Sec. 199. It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of

inhabitants in them, respectively; provided, that each county shall be entitled to at least one representative."

\* \* \*

"Sec. 200. It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other."

## APPENDIX "B"

### S. 29

By Mr. Gaither

Enrolled, An Act, Proposing an amendment to the Constitution of Alabama relating to legislative apportionment. BE IT ENACTED BY THE LEGISLATURE OF ALABAMA: Section 1. The following amendment to the Constitution of Alabama 1901 is proposed and shall become valid as a part thereof when approved and proclaimed as prescribed by law: Proposed Amendment 1. The legislature of Alabama shall consist of a senator for each county and 106 members of the house of representatives, to be apportioned among the several counties as herein prescribed; provided, that in addition to the above number of representatives each new county hereafter created shall be entitled to at least one representative. 2. At the general election in 1966, and every four years thereafter, a senator shall be elected by the qualified electors of each county in the state. 3. At the general election in 1966, and every four years thereafter, until the house of representatives is reapportioned as herein provided, the qualified electors of each county in the state shall elect such number of representatives as may be apportioned to the county as follows: The county of Jefferson shall have and elect seventeen representatives; the county of Mobile shall have and elect eight representatives; the county of Montgomery shall have and elect four representatives; the counties of Calhoun, Etowah, Madison and Tuscaloosa shall each have and elect three representatives; the counties of Dallas, Lauderdale, Morgan, Talladega and Walker shall each have and elect two representatives; and the remaining counties of the state shall each have and elect one representative. 4. On the first day, or within one week thereafter, of the regular session of the legislature in 1971, and every fifth regular session thereafter, the clerk of the house of representatives shall transmit to the secretary of state a statement showing the whole number of persons in each county under the most recent decennial census of the United States, and the number of representatives to which each county will be entitled under an apportionment of the then existing number of representatives by the

method known as the method of equal proportions, no county to receive less than one representative. 5. In Section 284 of this Constitution as amended, strike out the last sentence thereof and insert the following sentence: ·Representation in the house of representatives of the legis-lature shall be based upon population.. 6. Article IX (sections 197–203) of this Constitution is hereby expressly repealed. Section 2. An election upon the proposed amendment is ordered to be held on the date of the general election next succeeding the final adjournment of the current session of the Legislature. The election shall be held in accordance with the provisions of Sections 284 and 285 of the Constitution of Alabama, as amended, and Chapter 1, Article 18, Title 17 of the Code of Alabama 1940. Section 3. Notice of the election and of the proposed amendment shall be given by proclamation of the Governor, which proclamation shall be published once a week for four successive weeks next preceding the day appointed for the election in a newspaper in each county of the State. In every county in which no newspaper is published, a copy of the notice shall be posted at each courthouse and post office.

/s/ Albert Boutwell

President and Presiding Officer of the Senate.

NO. 93

RECEIVED

JUL 13 1962

TIME 2:20 P. M.

Secretary of State

'/s/ Virgis M. Ashworth

Speaker of the House of Representatives.

2–29–MS

S. 29

Senate 6–20–62

I hereby certify that the within Act originated in and passed the Senate, as amended.

Senate 7–12–62

I hereby certify that the within Act originated in and passed the Senate, as amended by Conference Committee Report.

J. E. Speight,
Secretary

House of Representatives
Passed 7–10–62, as amended.

Passed 7–12–62, as amended by Conference Committee Report.

By: Mr. Gaither.

APPENDIX "C".

Bevill, Shumate, Gilchrist,
Hanby, Oden

## H. 59

Enrolled, An Act, To fix the number of senators and representatives in the legislature, divide the state into senatorial districts, and apportion the senators and representatives among the several districts and counties.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1. The senate of the legislature shall be composed of 35 senators representing 35 senatorial districts, each district to elect one senator and no more.

Section 2. The state is hereby divided into 35 senatorial districts as follows:

First, the counties of Lauderdale and Limestone; second, the counties of Lawrence and Morgan; third, the counties of Cullman and Winston; fourth, the county of Madison; fifth, the counties of Jackson and Marshall; sixth, the county of Etowah; seventh, the county of Calhoun; eighth, the county of Talladega; ninth, the counties of Randolph and Chambers; tenth, the counties of Elmore and Tallapoosa; eleventh, the county of Tuscaloosa; twelfth, the counties of Fayette and Walker; thirteenth, the county of Jefferson; fourteenth, the counties of Pickens and Lamar; fifteenth, the counties of Autauga, Chilton and Shelby; sixteenth, the counties of Monroe and Wilcox; seventeenth, the counties of Butler, Covington and Conecuh; eighteenth, the counties of Bibb and Perry; nineteenth, the counties of Clarke, Choctaw and Washington; twentieth, the counties of Marengo and Sumter; twenty-first, the counties of Baldwin and Escambia; twenty-second, the counties of Blount and St. Clair; twenty-third, the counties of Dale and Geneva; twenty-fourth, the counties of Barbour and Pike; twenty-fifth, the counties of Coffee and Crenshaw; twenty-sixth, the counties of Bullock and Macon; twenty-seventh, the counties of Lee and Russell; twenty-eighth, the county of Montgomery; twenty-ninth, the counties of Cherokee and DeKalb; thirtieth, the counties of Dallas and Lowndes; thirty-first, the counties of Colbert, Franklin and Marion; thirty-second, the counties of Greene and Hale; thirty-third, the county of Mobile; thirty-fourth, the counties of Coosa, Clay and Cleburne; thirty-fifth, the counties of Henry and Houston.

In districts consisting of more than one county, the senators shall not be elected for more than one term consecutively from any one county in the district, but shall reside in and be elected alternately and in turn from each of the counties within such district. The first senator to be elected in such districts shall reside in the county having the largest population, except where that county had the last preceding senator. It is provided, however, that any senator in office on the effective date of this enactment shall be eligible to succeed himself as a member of the Senate, any other provision of this paragraph to the contrary notwithstanding.

Section 3. The house of representatives of the legislature shall consist of 106 members distributed among the several counties of the state as follows:

The county of Jefferson shall have and elect 12, the county of Mobile 6, and the county of Montgomery 4; the counties of Calhoun, Etowah, Madison and Tuscaloosa 3 each; the counties of Baldwin, Colbert, Cullman, Dallas, Houston, Lauderdale, Lee, Marshall, Morgan, Russell, Talladega and Walker 2 each; and the remaining counties 1 each.

Section 4. This Act shall take effect for the election of senators and representatives at the general election to be held in November 1966, and shall be effective thereafter until the legislature is reapportioned according to law.

Section 5. The provisions of this Act are severable. If any part of this Act is declared invalid or unconstitutional, such declaration shall not affect the part which remains.

/s/ Virgis M. Ashworth

Speaker of the House of Representatives

/s/ Albert Boutwell

President and Presiding Officer of the Senate

APPROVED July 12, 1962

TIME: 1037 AM

/s/ John Patterson

Governor

House of Representatives
July 10, 1962

I hereby certify that the within Act originated in and was passed by the House June 26, 1962 as amended.

Oakley Melton, Jr.
Clerk

| Senate | 7/7/62 | Amended and Passed |
| House | 7/10/62 | Concurred in Senate Amendment |

No. 91

RECEIVED

Jul 12 1962

TIME 10:45 A. M.

Secretary of State

APPENDIX "D"

REPRESENTATION BY COUNTIES: (1901–1960)

| County | 1901 | | | 1950 | | | 1960 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Pop. | No. Rep's | Pop. Per Rep. | Total Pop. | No. Rep's | Pop. Per Rep. | Total Pop. | No. Rep's | Pop. Per Rep. |
| 1. Autauga | 17,915 | 1 | 17,915 | 18,186 | 1 | 18,186 | 18,739 | 1 | 18,739 |
| 2. Baldwin | 13,194 | 1 | 13,194 | 40,997 | 1 | 40,997 | 49,088 | 1 | 49,088 |
| 3. Barbour | 35,152 | 2 | 17,576 | 28,892 | 2 | 14,446 | 24,700 | 2 | 12,350 |
| 4. Bibb | 18,498 | 1 | 18,498 | 17,987 | 1 | 17,987 | 14,357 | 1 | 14,357 |
| 5. Blount | 23,119 | 1 | 23,119 | 28,975 | 1 | 28,975 | 25,449 | 1 | 25,449 |
| 6. Bullock | 31,944 | 2 | 15,972 | 16,054 | 2 | 8,027 | 13,462 | 2 | 6,731 |
| 7. Butler | 25,760 | 2 | 12,880 | 29,228 | 2 | 14,614 | 24,560 | 2 | 12,280 |
| 8. Calhoun | 34,874 | 2 | 17,437 | 79,539 | 2 | 39,769 | 95,878 | 2 | 47,939 |
| 9. Chambers | 32,554 | 2 | 16,277 | 39,528 | 2 | 19,764 | 37,828 | 2 | 18,914 |
| 10. Cherokee | 21,096 | 1 | 21,096 | 17,634 | 1 | 17,634 | 16,303 | 1 | 16,303 |
| 11. Chilton | 16,522 | 1 | 16,522 | 26,922 | 1 | 26,922 | 25,693 | 1 | 25,693 |
| 12. Choctaw | 18,136 | 1 | 18,136 | 19,152 | 1 | 19,152 | 17,870 | 1 | 17,870 |
| 13. Clarke | 27,790 | 2 | 13,895 | 26,548 | 2 | 13,274 | 25,738 | 2 | 12,869 |
| 14. Clay | 17,099 | 1 | 17,099 | 13,929 | 1 | 13,929 | 12,400 | 1 | 12,400 |
| 15. Cleburne | 13,206 | 1 | 13,206 | 11,904 | 1 | 11,904 | 10,911 | 1 | 10,911 |
| 16. Coffee | 20,972 | 1 | 20,972 | 30,720 | 1 | 30,720 | 30,583 | 1 | 30,583 |
| 17. Colbert | 22,341 | 1 | 22,341 | 39,561 | 1 | 39,561 | 46,506 | 1 | 46,506 |
| 18. Conecuh | 17,514 | 1 | 17,514 | 21,766 | 1 | 21,766 | 17,762 | 1 | 17,762 |
| 19. Coosa | 16,144 | 1 | 16,144 | 11,766 | 1 | 11,766 | 10,726 | 1 | 10,726 |
| 20. Covington | 15,346 | 1 | 15,346 | 40,373 | 1 | 40,373 | 35,631 | 1 | 35,631 |
| 21. Crenshaw | 19,668 | 1 | 19,668 | 18,981 | 1 | 18,981 | 14,909 | 1 | 14,909 |
| 22. Cullman | 17,849 | 1 | 17,849 | 49,046 | 1 | 49,046 | 45,572 | 1 | 45,572 |
| 23. Dale | 21,189 | 1 | 21,189 | 20,828 | 1 | 20,828 | 31,066 | 1 | 31,066 |
| 24. Dallas | 54,657 | 3 | 18,219 | 56,270 | 3 | 18,757 | 56,667 | 3 | 18,889 |
| 25. DeKalb | 23,558 | 1 | 23,558 | 45,048 | 1 | 45,048 | 41,417 | 1 | 41,417 |

APPENDIX "D" (Continued)  REPRESENTATION BY COUNTIES:  (1901–1960)

| County | 1901 Total Pop. | No. Rep's | Pop. Per Rep. | 1950 Total Pop. | No. Rep's | Pop. Per Rep. | 1960 Total Pop. | No. Rep's | Pop. Per Rep. |
|---|---|---|---|---|---|---|---|---|---|
| 26. Elmore | 26,098 | 2 | 13,049 | 31,649 | 2 | 15,824 | 30,524 | 2 | 15,262 |
| 27. Escambia | 11,320 | 1 | 11,320 | 31,443 | 1 | 31,443 | 33,511 | 1 | 33,511 |
| 28. Etowah | 27,360 | 2 | 13,680 | 93,892 | 2 | 46,946 | 96,980 | 2 | 48,490 |
| 29. Fayette | 14,132 | 1 | 14,132 | 19,388 | 1 | 19,388 | 16,148 | 1 | 16,148 |
| 30. Franklin | 16,511 | 1 | 16,511 | 25,705 | 1 | 25,705 | 21,988 | 1 | 21,988 |
| 31. Geneva | 19,096 | 1 | 19,096 | 25,899 | 1 | 25,899 | 22,310 | 1 | 22,310 |
| 32. Greene | 24,182 | 1 | 24,182 | 16,482 | 1 | 16,482 | 13,600 | 1 | 13,600 |
| 33. Hale | 31,010 | 2 | 15,505 | 20,832 | 2 | 10,416 | 19,537 | 2 | 9,769 |
| 34. Henry | 36,146 | 2 | 18,073 | 18,674 | 2 | 9,337 | 15,286 | 2 | 7,643 |
| 35. Houston | | | | 46,522 | 1 | 46,522 | 50,718 | 1 | 50,718 |
| 36. Jackson | 30,508 | 2 | 15,254 | 38,988 | 2 | 19,494 | 36,681 | 2 | 18,341 |
| 37. Jefferson | 140,420 | 7 | 20,060 | 558,179 | 7 | 79,740 | 634,864 | 7 | 90,695 |
| 38. Lamar | 16,084 | 1 | 16,084 | 16,441 | 1 | 16,441 | 14,271 | 1 | 14,271 |
| 39. Lauderdale | 26,548 | 2 | 13,274 | 54,179 | 2 | 27,089 | 61,622 | 2 | 30,811 |
| 40. Lawrence | 20,124 | 1 | 20,124 | 27,128 | 1 | 27,128 | 24,501 | 1 | 24,501 |
| 41. Lee | 31,826 | 2 | 15,913 | 45,073 | 2 | 22,536 | 49,754 | 2 | 24,877 |
| 42. Limestone | 22,387 | 1 | 22,387 | 35,766 | 1 | 35,766 | 36,513 | 1 | 36,513 |
| 43. Lowndes | 35,650 | 2 | 17,825 | 18,018 | 2 | 9,009 | 15,417 | 2 | 7,709 |
| 44. Macon | 23,126 | 1 | 23,126 | 30,561 | 1 | 30,561 | 26,717 | 1 | 26,717 |
| 45. Madison | 43,702 | 2 | 21,851 | 72,903 | 2 | 36,451 | 117,348 | 2 | 58,674 |
| 46. Marengo | 38,314 | 2 | 19,157 | 29,494 | 2 | 14,747 | 27,098 | 2 | 13,549 |
| 47. Marion | 14,494 | 1 | 14,494 | 27,264 | 1 | 27,264 | 21,837 | 1 | 21,837 |
| 48. Marshall | 23,289 | 1 | 23,289 | 45,090 | 1 | 45,090 | 48,018 | 1 | 48,018 |
| 49. Mobile | 62,739 | 3 | 20,913 | 231,105 | 3 | 77,035 | 314,301 | 3 | 104,767 |
| 50. Monroe | 23,666 | 1 | 23,666 | 25,732 | 1 | 25,732 | 22,372 | 1 | 22,372 |

APPENDIX "D" (Continued)    REPRESENTATION BY COUNTIES: (1901-1960)

| County | 1901 Total Pop. | 1901 No. Rep's | 1901 Pop. Per Rep. | 1950 Total Pop. | 1950 Rep's No. | 1950 Pop. Per Rep. | 1960 Total Pop. | 1960 No. Rep's | 1960 Pop. Per Rep. |
|---|---|---|---|---|---|---|---|---|---|
| 51. Montgomery | 72,044 | 4 | 18,011 | 138,965 | 4 | 34,741 | 169,210 | 4 | 42,303 |
| 52. Morgan | 28,820 | 2 | 14,410 | 52,924 | 2 | 26,462 | 60,454 | 2 | 30,227 |
| 53. Perry | 31,782 | 2 | 15,891 | 20,439 | 2 | 10,219 | 17,358 | 2 | 8,679 |
| 54. Pickens | 24,402 | 1 | 24,402 | 24,349 | 1 | 24,349 | 21,882 | 1 | 21,882 |
| 55. Pike | 29,172 | 2 | 14,586 | 30,608 | 2 | 15,304 | 25,987 | 2 | 12,994 |
| 56. Randolph | 21,647 | 1 | 21,647 | 22,513 | 1 | 22,513 | 19,477 | 1 | 19,477 |
| 57. Russell | 27,082 | 2 | 13,541 | 40,364 | 2 | 20,182 | 46,351 | 2 | 23,176 |
| 58. Shelby | 23,684 | 1 | 23,684 | 30,362 | 1 | 30,362 | 32,132 | 1 | 32,132 |
| 59. St. Clair | 19,425 | 1 | 19,425 | 26,687 | 1 | 26,687 | 25,388 | 1 | 25,388 |
| 60. Sumter | 32,710 | 2 | 16,355 | 23,610 | 2 | 11,805 | 20,041 | 2 | 10,021 |
| 61. Talladega | 35,772 | 2 | 17,886 | 63,639 | 2 | 31,819 | 65,495 | 2 | 32,748 |
| 62. Tallapoosa | 29,674 | 2 | 14,837 | 35,074 | 2 | 17,537 | 35,007 | 2 | 17,504 |
| 63. Tuscaloosa | 36,146 | 2 | 18,073 | 94,092 | 2 | 47,046 | 109,047 | 2 | 54,524 |
| 64. Walker | 25,162 | 2 | 12,581 | 63,769 | 2 | 31,884 | 54,211 | 2 | 27,106 |
| 65. Washington | 11,134 | 1 | 11,134 | 15,612 | 1 | 15,612 | 15,372 | 1 | 15,372 |
| 66. Wilcox | 35,630 | 2 | 17,815 | 23,476 | 2 | 11,738 | 18,739 | 2 | 9,369 |
| 67. Winston | 9,554 | 1 | 9,554 | 18,250 | 1 | 18,250 | 14,858 | 1 | 14,858 |
| LARGEST— | | | 24,402 | | | 79,740 | | | 104,767 |
| SMALLEST— | | | 9,554 | | | 8,027 | | | 6,731 |
| DIFFERENCE | | | 14,848 | | | 71,713 | | | 98,036 |
| STATE | 1,828,697 | 105 | 17,416 | 3,061,743 | 106 | 28,884 | 3,244,386 | 106 | 30,607 |

## APPENDIX "E"

### SENATORIAL DISTRICTS

(one Senator per district)

| District | Total Population | | | Counties |
|---|---|---|---|---|
| | 1900 | 1950 | 1960 | |
| 1 | 48,946 | 89,945 | 98,135 | Lauderdale and Limestone |
| 2 | 48,944 | 80,052 | 84,955 | Lawrence and Morgan |
| 3 | 50,522 | 96,271 | 85,879 | Blount, Cullman and Winston |
| 4 | 43,702 | 72,903 | 117,348 | Madison |
| 5 | 53,797 | 84,078 | 84,699 | Jackson and Marshall |
| 6 | 52,749 | 120,579 | 122,368 | Etowah and St. Clair |
| 7 | 34,874 | 79,539 | 95,878 | Calhoun |
| 8 | 35,773 | 63,639 | 65,495 | Talladega |
| 9 | 54,201 | 62,041 | 57,305 | Chambers and Randolph |
| 10 | 55,774 | 66,723 | 65,531 | Elmore and Tallapoosa |
| 11 | 36,147 | 94,092 | 109,047 | Tuscaloosa |
| 12 | 55,378 | 99,598 | 84,630 | Fayette, Lamar and Walker |
| 13 | 140,420 | 558,179 | 634,864 | Jefferson |
| 14 | 57,112 | 47,959 | 41,923 | Pickens and Sumter |
| 15 | 57,121 | 75,470 | 76,564 | Autauga, Chilton and Shelby |
| 16 | 35,651 | 18,018 | 15,417 | Lowndes |
| 17 | 58,621 | 91,377 | 77,953 | Butler, Conecuh and Covington |
| 18 | 50,281 | 38,426 | 31,715 | Bibb and Perry |
| 19 | 57,060 | 61,312 | 59,180 | Choctaw, Clarke and Washington |
| 20 | 38,315 | 29,494 | 27,098 | Marengo |
| 21 | 48,180 | 98,172 | 104,971 | Baldwin, Escambia and Monroe |
| 22 | 35,631 | 23,476 | 18,739 | Wilcox |
| 23 | 40,285 | 46,727 | 53,376 | Dale and Geneva |
| 24 | 35,152 | 28,892 | 24,700 | Barbour |
| 25 | 69,812 | 80,309 | 70,479 | Coffee, Crenshaw and Pike |
| 26 | 55,070 | 46,615 | 40,179 | Bullock and Macon |
| 27 | 58,909 | 85,437 | 96,105 | Lee and Russell |
| 28 | 72,047 | 138,965 | 169,210 | Montgomery |
| 29 | 44,654 | 62,682 | 57,720 | Cherokee and DeKalb |
| 30 | 54,657 | 56,270 | 56,667 | Dallas |
| 31 | 52,346 | 92,530 | 90,331 | Colbert, Franklin and Marion |
| 32 | 55,193 | 37,314 | 33,137 | Greene and Hale |
| 33 | 62,740 | 231,105 | 314,301 | Mobile |
| 34 | 46,449 | 37,599 | 34,037 | Clay, Cleburne and Coosa |
| 35 | 36,147 [1] | 65,196 | 66,004 | Henry and Houston |
| 35 | 1,828,697 [2] | 3,061,743 | 3,266,740 [3]. | |

1. Houston added to circuit on creation of county out of Dale, Geneva and Henry in 1903.
2. True senatorial district in 1901—53,248.
3. True senatorial district in 1961—93,335.

## SENATE DISTRICTS PROVIDED IN "CRAWFORD–WEBB ACT" SHOWING POPULATION VARIATIONS

| DISTRICTS | POPULATION | VARIATION[1] | DISTRICTS | POPULATION | VARIATION[1] |
|---|---|---|---|---|---|
| **(Under Represented)** | | | | | |
| Jefferson | 634,864 | + 541,529 | Tallapoosa Elmore | 65,531 | − 27,804 |
| Mobile | 314,301 | + 220,966 | | | |
| Montgomery | 169,210 | + 75,875 | Talladega | 65,495 | − 27,840 |
| Madison | 117,348 | + 24,013 | Cullman Winston * | 60,430 | − 32,498 |
| Tuscaloosa | 109,047 | + 15,712 | | | |
| Lauderdale Limestone | 98,135 | + 4,800 | Choctaw Clarke Washington | 59,180 | − 34,155 |
| Etowah * | 96,980 | + 3,645 | Cherokee DeKalb | 57,720 | − 35,615 |
| Lee Russell | 96,105 | + 2,770 | Chambers Randolph | 57,305 | − 36,030 |
| Calhoun | 95,878 | + 2,543 | Dale Geneva | 53,376 | − 39,959 |
| **(Over Represented)** | | | St. Clair Blount * | 50,837 | − 42,496 |
| Colbert Franklin Marion | 90,331 | − 3,004 | Barbour Pike * | 50,687 | − 42,648 |
| Lawrence Morgan | 84,955 | − 8,380 | Marengo Sumter * | 47,139 | − 46,196 |
| Jackson Marshall | 84,699 | − 8,636 | Coffee Crenshaw * | 45,492 | − 47,843 |
| Baldwin Escambia * | 82,599 | − 10,736 | Wilcox Monroe * | 41,111 | − 52,224 |
| Butler Conecuh Covington | 77,953 | − 15,382 | Pickens Lamar * | 36,153 | − 56,182 |
| Autauga Chilton Shelby | 76,564 | − 16,771 | Bullock Macon | 40,179 | − 53,156 |
| Lowndes Dallas * | 72,084 | − 21,251 | Clay Cleburne Coosa | 34,037 | − 59,298 |
| Fayette Walker * | 70,359 | − 22,976 | Greene Hale | 33,137 | − 60,198 |
| Henry Houston | 66,004 | − 27,331 | Bibb Perry | 31,715 | − 61,620 |

1. Variation from Perfect District of 93,335.
* New districts created by this Act.